Antonio Llopart Morell, demandante, apelante y apelado, v. Providencia Mesorana Huete, demandada, apelada y apelante.

No. 6985.—*Sometido:* Noviembre 22, 1935. *Resuelto:* Diciembre 23, 1935.

M. *García Cabrera* y *Riera & Gutiérrez Franqui,* abogados del apelante y apelado; *Eduardo Urrutia Martorell,* abogado de la apelada y apelante.

EL JUEZ ASOCIADO SEÑOR CÓRDOVA DÁVILA, emitió la opinión del tribunal.

Antonio Llopart Morell y Providencia Mesorana Huete vivieron en concubinato desde 1919 hasta 1933. De esta unión nacieron dos hijos, llamados Antonio y Pablo, que en la actualidad tienen diez y ocho años de edad, respectivamente. En 1933 acordaron separarse. Al realizarse esta separación, las partes aceptaron, mediante contrato elevado a escritura pública, ciertas condiciones en relación con la propiedad adquirida durante el tiempo que existió dicha unión, y también en cuanto a la custodia y cuidado de los menores mencionados.

Se hizo constar en esta escritura que las partes nunca contrajeron matrimonio y que la propiedad que aparecía inscrita en el Registro de la Propiedad como bienes gananciales no lo era y sí pertenecía privativamente al Sr. Llopart.

También aclararon las partes en dicha escritura que los menores Antonio y Pablo habían sido inscritos en el registro civil como legítimos, cosa que no es cierta debido al hecho de que nunca habían contraído matrimonio las partes, pero reconocieron a los menores como hijos naturales. Convinieron las partes que los dos hijos quedarían bajo la custodia de la madre y al cuidado de la misma; que el padre conservaría sus relaciones de familia con sus hijos y que podría tenerlos consigo todo lo razonablemente posible. También convinieron que el padre les pasaría $25 semanales. Además se les concedió a los menores una casa en Santurce, la cual también se le dió en usufructo a la madre. Se acordó asimismo que el padre se reservaba el derecho de proceder a reclamar la custodia de sus hijos en caso de que la madre realizara cualquier acto que creyera el padre que razonablemente afectaría la moral y el bienestar de sus hijos.

Posteriormente la madre de los menores contrajo matrimonio con Luis Jordán, quien fué a vivir con ella a la casa donada por el padre a sus hijos.

Antonio, el mayor de los hijos, fué internado en el Colegio Ponceño de Varones, por acuerdo de las partes, sufragando el padre los gastos. Al empezar las vacaciones de Navidad de 1934, el padre trajo de Ponce a Antonio y lo dejó al cuidado del Sr. Benito Alvarez, quien reside en Miramar. La madre pasó por casa de este último y recogió a Antonio y se lo llevó para su propia casa.

Así las cosas, Antonio Llopart Morell radicó ante la Corte de Distrito de San Juan una solicitud de hábeas corpus contra Providencia Mesorana Huete, con el propósito de recobrar la custodia de ambos menores, Antonio y Pablo.

Se expidió el auto y después de visto el caso, la corte de distrito resolvió que el menor Antonio Llopart debería ingresar en un colegio interno dentro del distrito judicial de San Juan, y que el menor Pablo Llopart permaneciera bajo la custodia de la madre.

El padre, Antonio Llopart Morell, no conforme con la

resolución en cuanto al menor Pablo, apela de la misma para ante este tribunal. Providencia Mesorana también apela de dicha resolución, pero solamente en cuanto se refiere a la no imposición de costas al peticionario Antonio Llopart Morell.

El padre apelante señala como único error cometido por la corte de distrito el haber resuelto que el menor Pablo quedara bajo el cuidado de la madre, resolución que entiende el apelante es contraria a las disposiciones de los artículos 152 y 166 del Código Civil de Puerto Rico, edición 1930. También sostiene que esta resolución ha sido dictada en claro abuso de la discreción que como *parens patriae* le reconoce la jurisprudencia a las cortes de distrito.

Según las Partidas, "*patria potestas* es el poder que han los padres sobre los hijos." Part. 4ª., tít. XVII, ley 1ª. Este poder, que tiene su origen en el derecho romano, alcanzó en la antigüedad proporciones extraordinarias. El padre, jefe, dueño y señor de la familia, disponía de sus hijos como si se tratara de una propiedad. El hijo no emancipado por la voluntad del padre, permanecía, aunque fuese casado, durante toda su vida y en unión de su prole, bajo la potestad del padre. Este concepto de la patria potestad, tan severo en su origen, sufrió, en su proceso evolutivo, algunas modificaciones que limitaron las facultades del padre, impidiendo que castigara los delitos de sus hijos, autorizándole para hacerlo moderadamente respecto a sus faltas, y creando y desarrollando la doctrina de los peculios, que regularon las relaciones patrimoniales entre padre e hijos; pero subsistió, como apunta Laurent, el principio de donde provenía la barbarie: la idea de dominio, la ausencia de personalidad.

Roma prestó demasiada atención a la autoridad del padre, sin preocuparse del interés del hijo. Se concedieron al primero atribuciones exageradas, se pensó más en el derecho que en el deber, y la institución de la patria potestad en vez de beneficiar al hijo, se cuidó de consagrar y afirmar, llegando

a extremos deplorables, la autoridad paterna. De entonces acá las cosas han cambiado. El padre ha dejado de ser amo para convertirse en protector. La legislación moderna, inspirada en las leyes naturales, se ha preocupado más de los deberes que de los derechos del padre, quien también ha sabido responder al llamamiento de esa ley natural que le obliga a sacrificarse por sus hijos, a procurar su felicidad, a cuidar de su educación, de su desarrollo moral, intelectual y físico, y a prepararlos, en suma, para asumir las eventualidades y responsabilidades del porvenir, en el seno de la familia y en el campo más amplio de la sociedad. Los códigos actuales se han apartado del antiguo derecho, pudiendo decirse, con el comentarista Laurent, que entre los nuevos y los viejos principios media un verdadero abismo. Nuestro código refleja esa transformación.

Hay quienes oponen al tipo romano el tipo germánico, alegando que el primero, fundado exclusivamente en el interés del padre, convierte a éste más bien que en padre de familia, en jefe absoluto con el dominio de su casa, mientras que el segundo miraba principalmente al interés del hijo, siendo el padre su protector y no su amo. En Francia predominó en unas comarcas el espíritu germánico y en otras el romano. En España se nota una marcada diferencia entre las Partidas, de un lado, y de otro el Fuero Juzgo y el Fuero Real. Las primeras siguieron al pie de la letra la senda trazada por el derecho romano; los segundos se inspiraron en principios más humanos, en armonía con el derecho natural, concediendo a la madre, si el padre fuese muerto, la guarda de sus hijos y aceptando a su favor la patria potestad, aunque no con la necesaria claridad.

En 1870 la ley del matrimonio civil se encargó de afirmar la patria potestad de la madre. Esta ley, en su exposición de motivos, expresa el fundamento del principio en los términos que pasamos a transcribir:

"Tiempo es ya de borrar de nuestra legislación las huellas del derecho pagano de Roma, que vino a herir de muerte el Evangelio,

elevando a la mujer al puesto que le corresponde en el seno de la familia. Sea o no cierto que la legislación visigoda otorgase a la madre la potestad sobre sus hijos, es innegable que en aquel Código se aspira una más elevada doctrina sobre la mujer que la modelada en las leyes romanas, y que esa misma doctrina vaga en nuestra legislación foral con formas más o menos concretas. Más que de innovación, por lo tanto, la disposición del proyecto bien merece el nombre de último desarrollo de la teoría que tiene por objeto la emancipación jurídica de la mujer, y el reconocimiento de sus derechos en el seno de la familia: teoría cuyo germen fué arrojado al mundo con el Evangelio, desarrollándose después lentamente en nuestra legislación nacional con la institución de los gananciales o con los derechos otorgados a la madre sobre los hijos y sus bienes hasta llegar a su plenitud con lo que se dispone en el proyecto, que no rechazará nadie que conozca cuánta ternura, cuánta previsión, cuánta prudencia puede atesorarse en el corazón de una madre, cuya vida se concentra en el bienestar y en el porvenir de sus hijos.''

En el mismo sentido se expresa el Sr. García Goyena cuando dice que—

''. . . haciendo gozar a la madre de los derechos concedidos al padre, el legislador establece un derecho igual y una igual indemnización donde la naturaleza había establecido una igualdad de molestias, cuidados y afecciones; repara con esta equitativa disposición la injusticia de muchos siglos; hace en cierto modo entrar a la madre por primera vez en la familia, y la restablece en los derechos imprescriptibles que tenía por la naturaleza, derechos sagrados, despreciados con demasía por las legislaciones antiguas, reconocidos y acogidos por algunas de nuestras costumbres (fueros), pero que, aun borrados de nuestros Códigos, deberían haberse encontrado escritos con caracteres indelebles en el corazón de todos los hijos bien nacidos.''

La patria potestad establecida por la ley del matrimonio civil ha sido reconocida y confirmada por nuestro Código Civil, que la reconoce también a los padres naturales y al adoptante. Las disposiciones del código, basadas en principios de derecho natural ignorados por el derecho romano, amplían el concepto de la patria potestad, exclusiva de las justas nupcias, a la familia natural y a la adoptiva.

El artículo 154 del Código Civil español dice así: ·

"El padre, y en su defecto la madre, tienen potestad sobre sus hijos legítimos no emancipados; y los hijos tienen la obligación de obedecerles mientras permanezcan en su potestad, y de tributarles respeto y reverencia siempre.

"Los hijos naturales reconocidos, y los adoptivos menores de edad, están bajo la potestad del padre o de la madre que los reconoce o adopta y tienen la misma obligación de que habla el párrafo anterior."

Y el artículo 152 de nuestro Código Civil, edición 1930, que el apelante considera infringido, dispone:

"La patria potestad sobre los hijos legítimos no emancipados corresponde, en primer término, al padre, y en ausencia, impedimento legal o muerte de éste, a la madre.

"Los hijos ilegítimos, y los adoptivos menores de edad, estarán bajo la potestad del padre o de la madre que los haya reconocido o adoptado. Si ambos los hubieran reconocido o adoptado, será en ese caso aplicable lo dispuesto en el párrafo primero de este artículo."

Obsérvase una marcada diferencia entre el código español y el nuestro en lo que respecta a los hijos naturales y adoptivos. El primero concede la patria potestad al padre o la madre que reconoce o adopta; el segundo dispone que cuando ambos padres hayan reconocido o adoptado, será aplicable el párrafo primero del artículo 152, es decir, corresponderá la patria potestad en primer término al padre, y en ausencia, impedimento legal o muerte de éste, a la madre.

Nuestro código concede al padre del hijo natural la misma preferencia que reconoce a favor del padre legítimo. Sin embargo, la situación es distinta. Comentando el artículo 155 del Código español (equivalente al 153 de nuestro código, ed. 1930), según el cual el padre, y en su defecto la madre, tienen, respecto de sus hijos no emancipados, entre otros deberes el de tenerlos en su compañía, dice Scaevola que si el padre legítimo goza de preeminencia con relación a determinados efectos de la patria potestad, pues respecto de otros existe igualdad, de hecho al menos entre los padres, no es

dable que el padre natural sea preferido siempre respecto de la madre. Añade que el matrimonio constituye una entidad, y la ley concede la preferencia al marido. El padre y la madre naturales son dos personalidades diversas con derechos exactamente iguales, sin que pueda prevalecer por sí el del uno sobre el otro. A juicio de Scaevola, gozando ambos padres de la patria potestad, sin constituir una nueva personalidad, al padre que reconoce primeramente al hijo debe asistir el derecho de tenerlo en su compañía. 3 Scaevola 278. Como ya hemos dicho, el distinguido comentarista expone este criterio comentando el artículo 155 del Código Civil español. Las palabras de Scaevola, sin embargo, pueden haberse inspirado en el artículo 154 del Código Civil, que no prevé el caso de que ambos padres hayan reconocido al hijo para declarar a cual de ellos corresponde la patria potestad, pero sea como fuere, la verdad es que el comentarista citado expone con viva realidad la diferencia existente entre la relación conyugal y las relaciones de los padres naturales. Más adelante nos dice el mismo Scaevola que en la familia natural no existe la unidad que en la legítima, constitutiva de la sociedad conyugal, y que, con patria potestad o sin ella, el padre y la madre no tienen entre sí lazo alguno legal, causa de la preeminencia del marido sobre la mujer.

En la opinión disidente emitida en el caso de *Arbona* v. *Torres,* 24 D.P.R. 456, el Juez Presidente Sr. Hernández nos dice que el artículo 223 del Código Civil Revisado (153, ed. 1930) al fijar los efectos de la patria potestad respecto a las personas de los hijos, parece referirse a un estado normal en que el hombre y la mujer viven bajo un mismo techo con sus hijos, sean éstos legítimos o naturales, en un hogar común. De la opinión disidente emitida en el caso citado, que fué aceptada por este tribunal en *Chabert* v. *Sánchez,* 29 D.P.R. 241, copiamos lo siguiente:

"Para el caso de relaciones ilícitas terminadas de hombre y mujer con hijos naturales procreados durante esas relaciones, expresamente nada provee la legislatura y nos parece contraria a la razón

natural y a la equidad la teoría de negar a la madre natural toda clase de derechos mientras viva el padre que ha reconocido la prole en aquélla habida, y otorgar al padre natural que sin razón alguna abandona a la mujer·en quien ha procreado hijos, privilegios que no tiene el hombre que engendra hijos dentro del matrimonio y abandona a su legítima esposa. Semejante teoría conduciría al absurdo de reconocer a un padre más desnaturalizado que natural, el derecho de arrancar a un hijo reconocido de los brazos de su madre, en los primeros días de su existencia en que necesita ser lactado.''

El ejemplo ofrecido por el Juez Hernández es convincente y decisivo. No creemos exista un tribunal que se atreva a consagrar el absurdo, y si lo hubiera, si se permitiese a un padre natural arrancar del regazo maternal a un hijo acabado de nacer, ese tribunal estaría violando los principios más elementales de la ley natural y de la justicia.

''No es posible'', continúa diciendo el Juez Hernández en su opinión, ''sentar como principio absoluto e inflexible que el hijo natural haya de vivir con el padre que lo ha reconocido y ejerce sobre él el derecho de patria potestad. Las condiciones del ejercicio de ese derecho deben regularse por las cortes, según las circunstancias especiales de cada caso, sin olvidar nunca que la patria potestad según nuestro derecho actual no es un beneficio para el padre o para la madre, sino para el niño que de ella necesita.''

En *Chabert* v. *Sánchez,* supra, se transcriben y desarrollan los principios enunciados por el Juez Hernández en su opinión disidente, y en decisiones posteriores de este tribunal se ha ratificado la misma doctrina. *Blanco* v. *Hernández,* 32 D.P. R. 22; *Babá* v. *Rodríguez,* 36 D.P.R. 502; *Ex parte Maldonado,* 42 D.P.R. 867; *Chardón* v. *Corte,* 45 D.P.R. 621.

Nuestro Código Civil no puede repudiar las conclusiones del Juez Hernández, porque están inspiradas en un sentimiento genuinamente natural y humano y porque sienta el principio, aceptado por todos los comentaristas modernos, de que la patria potestad no se establece para provecho del padre, sino para beneficio del hijo.

El comentarista Manresa, refiriéndose indistintamente a los padres legítimos y naturales, se expresa así en lo que se refiere a la custodia de los hijos:

"Según el Código, tienen además los padres el deber de tener a los hijos en su compañía. Forma, efectivamente, parte de los cuidados que requieren los seres físicos el proporcionarles *lugar donde moren,* como decían las Partidas; pero a la vez es un derecho que corresponde a los padres para cumplir con acierto las obligaciones anteriormente indicadas. Como derecho podría ser renunciado, no así en cuanto es un deber. Entendemos, sin embargo, que cuando sea contrario al interés del hijo, como el deber se impone precisamente en beneficio de éste, podrá el padre disponer que viva separado de su hogar, lo que acontece cuando lo exigen las necesidades de sus estudios o de su profesión." 2 Manresa, "Comentarios al Código Civil," 18.

Con mucho acierto nos dice el ilustre comentarista que la guarda de los hijos por el padre constituye un deber y un derecho. Considerada como un derecho, bien puede ser renunciada por el padre en beneficio del hijo, para que more en el hogar de la madre, bajo su inmediata custodia y amparo, y reciba las ternuras y atenciones propias del amor maternal. En cuanto al deber, ha sido impuesto al padre para beneficiar al hijo, y, si colocándolo bajo la custodia de la madre se cumple el propósito de la ley en interés del débil, no se violan principios de derecho natural y antes bien se está en armonía con ellos y con el pensamiento del legislador, cuando ese propósito recibe mayor efectividad en el regazo maternal que en la compañía del padre.

En el caso *Ex parte Kirschner,* 111 Atl. 737, resuelto por la Corte de Cancillería de New Jersey, se dice lo siguiente:

"Existe una importante distinción entre los derechos del padre a la custodia de sus hijos y sus deberes con respecto a sostenerlos. Las dos cosas son completamente distintas. Los derechos paternales pueden ser trasmitidos o abandonados. Excepto mediante procedimientos de adopción, el deber del padre es intransmisible."

En *Nugent* v. *Powell,* 20 L.R.A. 199, la Corte Suprema de Wyoming se expresó así:

"Pero, ¿cuáles son los derechos del padre con respecto a su hijo? Se sostiene en este caso, y existen muchas aseveraciones en los libros, que en la ley común el padre tiene el derecho supremo a la custodia del hijo y que independientemente de los estatutos tal es la regla prevaleciente en América. Si esta aseveración simplemente significa que la ley ha impuesto al padre el deber de cuidar y mantener a su hijo menor de edad, y le ha dado por tanto la custodia y dominio del mismo a fin de que pueda en la mejor forma posible cumplir con estos deberes, puede considerarse como correcta; y en términos generales podría decirse que siendo similares todas las circunstancias concurrentes, el padre tiene mejor derecho a la custodia y compañía de su hijo que la madre, porque la ley primordialmente impone al padre el deber de alimentarlo y cuidarlo. Mas, a mi juicio, ha quedado bien establecido que el padre no tiene un derecho adquirido absoluto a la custodia de su hijo. El Juez Story, en el caso de U. S. v. Green, 3 Mason 485, expone la que a mi juicio parece ser la verdadera regla, así: 'En lo que al derecho del padre a la custodia de su hijo en términos generales se refiere, ello es cierto. Pero esto no se debe a ningún derecho absoluto del padre, sino que se hace en beneficio del menor; presumiendo la ley que será provechoso para éste estar bajo la custodia y cuidado de su protector natural, tanto en lo que a su sostenimiento como a su educación se refiere . . . Es enteramente erróneo suponer que en todo momento la corte está obligada a entregar el menor a su padre, o que este último tiene un derecho absoluto a tenerlo bajo su custodia.' Muy bien podría dudarse si la regla del derecho común era distinta a la enunciada en el caso citado. De un examen de las autoridades se verá que antes de 1804 las cortes de Inglaterra sostenían precisamente el criterio expresado por el Juez Story, citado más arriba. Durante ese año las decisiones en Inglaterra siguieron un curso en favor de establecer el derecho supremo del padre a la custodia de su hijo menor de edad, y continuaron en esa dirección hasta que culminaron en la famosa decisión dictada en 1836 en el caso de King v. Greenhill, 4 Ad. & El. 624, en el cual tres niñas de cinco y medio, cuatro y medio, y dos y medio años estaban bajo la custodia de la madre, que era una mujer de conducta impoluta e irreprochable. A virtud de una petición radicada por el padre, que vivía públicamente en adulterio con otra mujer, las hijas fueron sacadas de la custodia de la madre y entregadas al padre. Estas decisiones hicieron que se pre-

sentara un proyecto en el Parlamento en relación con la custodia de los menores, proyecto que finalmente en 1838 o 1839 se convirtió en ley, restituyendo a la madre sus derechos naturales y colocándola en un plano igual al de su esposo en relación con el cuidado y custodia de los hijos menores de edad. Al debatirse el proyecto Lord Lyndhurst, refiriéndose a la decisión en el caso de King v. Greenhill, dijo: 'Según el estado actual de la ley, el padre de un niño nacido dentro de matrimonio tiene derecho absoluto al dominio y custodia de él, y ha excluído de participar en dichos dominio y custodia a la madre del menor. Esta puede ser la mujer más virtuosa del mundo, agradable en su trato, cariñosa y apegada a sus hijos. El padre, por otra parte, puede ser de carácter irascible, brutal en sus modales, vivir en adulterio, y no embargante tener derecho bajo la ley actual a la custodia de los hijos habidos en el matrimonio con exclusión absoluta de su esposa, madre de ellos.' Lord Denman, que presidía la Corte del Rey, y que concurrió en la decisión del caso arriba mencionado, en el curso del debate sobre el proyecto referido, dijo que en el caso de Greenhill, resuelto en 1836, visto ante él y ante los otros jueces de la Corte del Rey, creía que no había un solo juez que no se hubiera avergonzado del estado de la ley, y que la misma era tal que la hacía odiosa ante los ojos del país. El efecto de dicho caso fué permitir al padre privar a su esposa, joven y virtuosa, de la custodia de sus hijos, y ponerlos al cuidado de una mujer con quien vivía en concubinato. Si ésa era la ley común en Inglaterra, no es de sorprender que Lord Denman dijera que se avergonzaba de ella. Mas, conforme dice el Juez Presidente Ranney en Gishwiler v. Dodez, 4 Ohio St. 623, estoy enfáticamente inclinado a creer que el distinguido Juez Presidente de la Corte del Rey tomó erróneamente una excrecencia judicial sobre la ley por la ley misma, y que el Parlamento no hizo otra cosa que restablecerla a su estado anterior. Sin embargo, si los casos ingleses a que se alude expresaban razonablemente el derecho común, podría decirse sin temor alguno que nunca han tenido eco en la jurisprudencia americana, y no abrigo la menor duda de que en la jurisprudencia americana el derecho del padre a la custodia de su hijo no es un derecho absoluto e inalienable, y que en todos los casos está sujeto y subordinado al interés y al bienestar del menor. Mercein v. People, 25 Wend. 64. Se ha dicho que 'por la ley natural, el padre no tiene un derecho supremo a la custodia del menor. Según ese derecho la mujer y el menor están situados en el mismo plano para el esposo y para el padre . . . . No existe autoridad paternal independientemente del poder supremo del estado, pues la primera se deriva enteramente del

último. En el estado civil de las personas no existe desigualdad alguna entre el padre y la madre. Ordinariamente un niño durante su infancia está completamente bajo la disciplina de su madre y con bastante frecuencia las esposas desempeñan mejor el deber de educar a sus hijos que sus maridos . . . ' ' ''

Los principios enunciados en la opinión que antecede no pueden estar en pugna con nuestro derecho civil, que reconoce hoy a la madre derechos que nunca debieron serle discutidos.

■ Alega el apelante que el artículo 166 del Código Civil enumera los casos en que los padres pueden ser privados de la patria potestad o suspendidos en su ejercicio, y acepta la doctrina de que cuando se trata de la custodia de los menores, el mero derecho de patria potestad no debe prevalecer sobre su conveniencia y bienestar; pero arguye que en ninguno de los casos resueltos por esta corte se ha concedido autoridad a los tribunales para privar a un padre de la custodia de sus hijos sin que concurran circunstancias que justifiquen esta medida extrema y radical. A juicio del apelante esas circunstancias no concurren en el presente caso. Conviene hacer constar que la guarda de los hijos es uno de los efectos de la patria potestad y que el mero hecho de que en un caso dado se regule ese ejercicio por el poder supremo y privilegiado del estado a través de sus tribunales, no quiere decir que se prive necesariamente al padre de la patria potestad.

■ La prueba demuestra que el peticionario vivió en concubinato con la Sra. Mesorana por un período de catorce años y que de estas relaciones nacieron dos hijos que el padre no tuvo a bien legitimar, aunque fueron inscritos como legítimos en el Registro Civil. Las propiedades adquiridas durante estas relaciones pasaron al padre, con excepción de una casa cedida en usufructo a la madre durante la minoridad de sus hijos, a quienes fué transferida la nuda propiedad. Por lo demás, el padre ha cumplido satisfactoriamente su deber de sostener a sus hijos, y se dice con énfasis que dada su conducta y no habiéndose demostrado que el

bienestar del menor Pablo requiere que éste viva en compañía de la madre, debe concederse la custodia del mismo a su padre natural. Los padres, sin embargo, llevaron a cabo un convenio en virtud del cual los hijos quedaron bajo la guarda de la madre, reservándose el padre el derecho de reclamarla en caso de que la madre realizase algún acto que creyese el padre que razonablemente afectaría la moral y el bienestar de sus hijos. No surge de la prueba que la madre haya realizado ningún acto de esta naturaleza. Por el contrario, se ha demostrado que la Sra. Mesorana contrajo matrimonio después de la separación y que el menor vive hoy en un hogar consagrado por la ley. El *status* de la madre es en la actualidad superior al que tenía cuando vivía en concubinato con el peticionario. En cuanto al bienestar de los menores, es de suponerse que fué tenido en cuenta por el peticionario, al confiarle su custodia a la madre mediante un convenio otorgado ante notario en el momento de la separación. Es lógico asumir que la madre quedó a cargo de la custodia de sus hijos porque las partes contratantes creyeron que los mismos estarían mejor atendidos y cuidados viviendo en el hogar materno que en la compañía del padre, que carecía de hogar. Las circunstancias no han variado para el peticionario que continúa su vida de soltero y que no pudiendo ofrecerle un hogar propio a sus hijos, tiene el propósito de llevarlos a vivir a casa de un amigo; pero sí han variado favorablemente para la madre, que ha mejorado su estado civil ingresando en la vida matrimonial. A nuestro juicio el peticionario contrajo un compromiso válido que está obligado a respetar mientras no resulte perjudicado el bienestar del menor. No concebimos cómo pueda considerarse contrario a la moral y al orden público un convenio en virtud del cual el padre confía la custodia de sus hijos a la madre de los mismos, sobre todo cuando son de tierna edad. La razón natural demuestra todo lo contrario. La moral y el orden público no pueden resentirse, porque se ofrezca a los hijos el cuidado que necesitan para su propio bienestar.

Sabido es que estos cuidados, que requieren abnegación y sacrificios, no son por regla general los padres los llamados a prestarlos, sino aquellos seres en los cuales la naturaleza ha puesto las ternuras y el afecto que surgen de la relación maternal.

La mayoría de los tribunales americanos ha resuelto que estos contratos entre madre y padre sobre la custodia de menores son válidos y deben cumplirse, siempre y cuando no se perjudique el bienestar de los mismos.

En el caso de *Edleson* v. *Edleson,* 179 Ky. 300, 200 S. W. 625, 631, la Corte Suprema de Kentucky se expresa en los siguientes términos:

"El Canciller, al fijar la custodia del menor, considerará primordialmente el bienestar del mismo, y, en caso de separación de los padres, confiará su custodia al que mejor pueda cumplir con este deber, ya que el derecho de cada uno a la custodia es de igual dignidad. No es, sin embargo, ilegal para padres que se han separado, hacer un contrato para la custodia y manutención de su hijo, pero las cortes no reconocerán tales contratos a menos que éstos aseguren el debido cuidado y manutención del menor. Si el contrato es de tal naturaleza que la corte podría aprobarlo, tomando en consideración el bienestar del menor, puede reconocer el contrato, pero tal contrato no se hará efectivo por un tiempo mayor que el que demande el interés del menor, y se presumirá que los padres que celebren estos contratos lo hacen teniendo en cuenta sus obligaciones legales y los derechos del menor. Sin embargo, mientras sea aceptado por la corte el contrato que ha sido efectuado entre los padres, sus disposiciones deben hacerse efectivas. La corte, sin embargo, puede confiar la custodia del menor a la madre y obligar al padre a contribuir a su sostenimiento, si sus respectivas condiciones para hacerse cargo de la custodia y sus circunstancias económicas así lo requieren para el debido cuidado del menor."

En *Carpenter* v. *Carpenter,* 149 Mich. 138, 112 N. W. 748, 749, se dice:

"Un marido y su esposa, al separarse, pueden celebrar un contrato válido para el cuidado de sus hijos menores. Tal contrato, aunque válido entre las partes, no será sostenido en detrimento del menor, cuyos intereses son fundamentales."

En el caso de *Tiffany & Co.* v. *Spreckles,* 202 Cal. 778, 791, la corte dijo:

"Los padres tienen derecho a contratar entre sí con respecto a la custodia y gobierno de sus hijos. (Citas.) Este derecho, sin embargo, está sujeto al poder de la corte en procedimientos en los cuales esté envuelto el bienestar del menor. (Cita.) Pero entre los padres mismos, una promesa por uno de ellos en el sentido de que puede tener la custodia y el gobierno de su hijo, es legal y envuelve suficiente causa para sostener y hacer respetar un convenio en beneficio del padre a cuyo favor se hizo la promesa."

En *Nugent* v. *Powell,* supra, se dice:

"En Clark v. Bayer, 32 Ohio St. 310, 30 Ann. Rep. 593, la Corte, después de un estudio laborioso de todas las decisiones, dice: 'Tomando como base la razón y las decisiones judiciales, pueden establecerse las siguientes teorías: (1) Como regla general los padres tienen el derecho a la custodia de sus hijos menores. Cuando los padres viven separados, el padre tiene un derecho prima facie a esa custodia; y cuando él es una persona aceptable, capaz y deseoso de mantenerlos y cuidarlos, su derecho está por encima de todas las demás personas con excepción de la madre en los casos en que el menor sea de una edad tan corta que requiera su cuidado inmediato; pero en todos los casos en que aparezca controvertido este derecho a la custodia, el bienestar del menor debe ser fundamental. (2) El derecho del padre, sin embargo, no es absoluto bajo todas las circunstancias. Puede renunciarlo por contrato, perderlo por abandono o por encontrarse en condiciones tales que se le haga imposible cuidar y mantener a sus hijos menores.' "

En el caso de *Brice* v. *Brice,* 50 Mont. 388, 147 P. 164, 166, la Corte Suprema de Montana resuelve:

"Entre marido y esposa, un acuerdo sobre la custodia y sostenimiento de los hijos será respetado y puesto en vigor. Empero, este acuerdo no puede relevar a cualquiera de ellos del deber primordial que le impone la ley de mantenerlos y educarlos."

En el caso de *Maxwell* v. *Boyd,* 123 Mo. Ap. 334, 100 S. W. 540, la corte se expresa en los siguientes términos:

"Que los contratos de separación entre marido y mujer son contrarios al orden público y no pueden hacerse efectivos en ley o equi-

dad es una doctrina ya bien establecida. En esto está conforme el demandante. Pero ésta no es una acción entre el marido y la mujer sobre el contrato, ni para hacer efectiva ninguna disposición del mismo que resulte beneficiosa o lucrativa para la mujer. El demandado ocupa la siguiente posición: él renunció el cuidado y la custodia de su hijo menor y convino en pagar a una tercera persona, como fiduciario, la suma de $50 al año, para el sostenimiento del menor. Se obligó a hacer lo que la ley natural y la ley del estado disponen que debe hacerse, y lo que la ley del estado, en un caso adecuado, lo obligaría a hacer. Ahora bien, el hecho de que eligiese a su mujer, con la cual había acordado una separación, para encargarle la custodia del menor, ¿le releva de hacer aquello que él tenía el deber de ejecutar y que se obligó a realizar mediante contrato? Opinamos que no. Creemos que la parte del contrato que dispone la separación del demandado y su mujer es nula, y que la parte por la cual él se obliga a pagar $50 anuales para mantener su hijo es válida y lo obliga mientras el hijo sea menor de edad, si él permite que continúen las condiciones con las cuales él no solamente asintió sino que fueron creadas por sus propios actos y ratificadas posteriormente mediante el pago de la suma indicada al fiduciario del menor. El acuerdo en relación con el menor no tiene ninguno de los elementos viciosos de un contrato de separación entre marido y mujer. Este punto de vista está apoyado por el caso de Meyer v. Kuechler, 10 Mo. App. 371. El demandado no podía evadir su obligación de mantener su hijo por el hecho de que llevase a cabo un convenio para vivir separado de su esposa, entregándole la custodia del menor.''

En el caso citado anteriormente, la corte, a pesar de considerar nula la parte del contrato donde se acordaba la separación de ambos esposos, estimó válida la estipulación que colocaba al hijo menor bajo la custodia de la madre. Nuestro caso ni siquiera ofrece esta complicación, porque no se trata de dos esposos, sino de dos personas que vivían en concubinato y acordaron separarse, quedando los hijos nacidos de estas relaciones bajo la custodia de la madre.

La corte inferior no tuvo a bien imponer las costas al peticionario. Esta parte de la resolución ha sido recurrida también por la Sra. Mesorana. Nos inclinamos a respetar

el pronunciamiento citado del tribunal *a quo* en el ejercicio de su discreción judicial.

*Debe confirmarse la resolución apelada.*

El Juez Asociado Señor Wolf está conforme con el resultado.*

El Juez Asociado Señor Aldrey no intervino.