DOMINGA SOTO CABRAL y OTROS, demandantes y recurridos, *v.*
ESTADO LIBRE ASOCIADO DE PUERTO RICO, UNIVERSIDAD DE
PUERTO RICO y OTROS, demandados y peticionarios.

*Números:* CE-93-547 *Resueltos:* 21 de abril de 1995
CE-93-548

300

302

*Manuel San Juan*, de *Jiménez, Graffam & Lausell*, abogado de la Universidad de Puerto Rico, peticionario; *Pedro A. Delgado Hernández, Procurador General, Reina Colón de Rodríguez, Subprocuradora General Interina*, y *Vannessa Ramírez, Procuradora General Auxiliar*, abogados del Estado Libre Asociado de Puerto Rico, peticionario; *María Jiménez Vargas*, abogada de los recurridos.

EL JUEZ ASOCIADO SEÑOR FUSTER BERLINGERI emitió la opinión del Tribunal.

En *Torres Ortiz v. Plá*, 123 D.P.R. 637 (1989), resolvimos que en Puerto Rico procede una acción de daños y perjuicios bajo el Art. 1802 de nuestro Código Civil, 31 L.P.R.A. sec. 5141, contra un médico que realiza una operación de esterilización de manera negligente y que, de prevalecer la parte demandante en dicha acción, procede que se le compense por ciertos daños relacionados con las intervenciones quirúrgicas y el embarazo. En aquella ocasión dejamos sin resolver si procedía compensarle, además, por los costos de manutención y de educación del recién nacido. Hoy nos toca resolver esta cuestión.

I

El 9 de octubre de 1991 Dominga Soto Cabral, su esposo Luis P. Castillo y la sociedad de gananciales integrada por ambos presentaron una demanda de daños y perjuicios por mala práctica de la medicina contra el Estado Libre Asociado de Puerto Rico (en adelante E.L.A.) —en calidad de representante del Hospital Universitario del Centro Médico— el Recinto de Ciencias Médicas de la Universidad de Puerto Rico (en adelante U.P.R.) —en calidad de operadores de la Clínica de Obstetricia y Ginecología del Hospital Universitario— y otros, cuyos nombres desconocían en ese

momento. En ella los demandantes alegaron, en síntesis, que al acudir al Hospital Universitario para que Soto Cabral fuera atendida durante un parto contrataron para que, una vez ésta diera a luz, los demandados y/o sus empleados le hicieran una operación de esterilización mediante "laparascopía";(¹) que siete (7) meses después de que la operación fuera realizada la demandante había quedado embarazada, y que ello había ocurrido debido a la negligencia del personal médico que realizó la operación de esterilización. Alegaron, además, que la decisión de que Soto Cabral se sometiera a la operación de esterilización había sido tomada entre los esposos demandantes, en consideración de la edad de Soto Cabral (treinta y siete (37) años), la situación económica de ambos y "el deseo mutuo de no procrear más".(²)

En cuanto a los daños sufridos, los demandantes alegaron que el embarazo "no deseado" les había ocasionado problemas y tensión en su relación conyugal; que tuvieron sentimientos de culpa, angustia y ansiedad, y que su situación económica era precaria y no estaban en la posición de mantener otro hijo.(³) Como consecuencia, solicitaron una partida de $50,000 para cada uno por concepto de angustias mentales generales; una partida especial de $25,000 para Soto Cabral por el dolor, el sufrimiento y la angustia mental relacionados con el parto, y *una partida de*

---

(¹) Este tipo de operación fue la misma que se utilizó en el caso de *Torres Ortiz v. Plá*, 123 D.P.R. 637, 640 (1989), la cual describimos en aquella ocasión de la manera siguiente:

"En este proceso se inyecta bióxido de carbono u otro gas en el vientre, que ocasiona la distensión y separación de los órganos para ayudar a detectar los órganos reproductores. Se realiza una pequeña incisión abdominal a través de la cual se introduce el laparoscopio. Se ilumina el interior del abdomen y con una especie de garfios se agarran los tubos de falopio. Se colocan unos anillos, en este caso de silicón (*fallope rings*), que ligan y comprimen los tubos para evitar que pasen los óvulos. Luego de separar los tubos se sacan los instrumentos y el gas."

(²) Al momento de que Soto Cabral se sometiera a la operación de esterilización, los demandantes tenían tres (3) hijos.

(³) Alegaron, además, que la demandante no tenía ningún tipo de preparación profesional ni técnica y que el demandante trabajaba como pintor de residencias y recibía un salario irregular.

*$100,000 para la sociedad de gananciales por "el costo que este nuevo hijo le ocasionará a sus padres".*

El 5 de noviembre de 1992 la U.P.R. solicitó la desestimación de la reclamación en su contra por el costo de manutención del recién nacido. En esencia, le solicitó al tribunal que adoptara la norma que rige en la mayoría de las jurisdicciones norteamericanas de no conceder este tipo de indemnización por razones de política pública.([4]) A su vez,

---

([4]) Como señaláramos en *Torres Ortiz v. Plá*, supra, la mayoría de las jurisdicciones norteamericanas que han tratado este tema han adoptado la doctrina de compensación limitada bajo la cual no procede la compensación por los costos de crianza del niño.

Actualmente, treinta y siete (37) jurisdicciones norteamericanas han resuelto que procede una acción en daños como resultado de una operación de esterilización realizada de manera negligente. De éstas, veintinueve (29) prohíben la indemnización por los costos de crianza del menor como cuestión de derecho, por razones de política pública. Véanse: *Boone v. Mullendore*, 416 So. 2d 718 (1982); *Wilbur v. Kerr*, 628 S.W.2d 568 (1982); *Coleman v. Garrison*, 349 A.2d 8 (1975); *Flowers v. District of Columbia*, 478 A.2d 1073 (1984); *Fassoulas v. Ramey*, 450 So. 2d 822 (1984); *Fulton-Dekalb Hosp. Authority v. Graves*, 314 S.E.2d 653 (1984); *Cockrum v. Baumgartner*, 447 N.E.2d 385, cert. denegado, 464 U.S. 846 (1983); *Garrison v. Foy*, 486 N.E.2d 5 (1985); *Nanke v. Napier*, 346 N.W.2d 520 (1984); *Byrd v. Wesley Medical Center*, 699 P.2d 459 (Kan. 1985); *Schork v. Huber*, 648 S.W.2d 861 (1983); *Macomber v. Dillman*, 505 A.2d 810 (1986); *Rouse v. Wesley*, 494 N.W.2d 7 (1992), ap. denegado, 503 N.W.2d 440 (1993); *Girdley v. Coats*, 825 S.W.2d 295 (1992) (en banc); *Szekeres by Szekeres v. Robinson*, 715 P.2d 1076 (Nev. 1986); *Kingsbury v. Smith*, 442 A.2d 1003 (1982); *P. v. Portadin*, 432 A.2d 556 (1981); *O'Toole v. Greenberg*, 477 N.E.2d 445 (1985); *Jackson v. Bumgardner*, 347 S.E.2d 743 (1986); *Johnson v. University Hospital*, 540 N.E.2d 1370 (1989); *Goforth v. Porter Medical Associates, Inc.*, 755 P.2d 678 (Okl. 1988); *Mason v. Western Pennsylvania Hosp.*, 453 A.2d 974 (1982); *Smith v. Gore*, 728 S.W.2d 738 (1987); *Terrel v. Garcia*, 496 S.W.2d 124 (Tex. Ct. App. 1973), cert. denegado, 415 U.S. 927 (1974); *C.S. v. Nielson*, 767 P.2d 504 (Utah 1988); *Miller v. Johnson*, 343 S.E.2d 301 (1986); *McKernan v. Aasheim*, 687 P.2d 850 (Wash. 1984); *James G. v. Caserta*, 332 S.E.2d 872 (1985); *Beardsly v. Wierdsma*, 650 P.2d 288 (Wyo. 1982).

En *Torres Ortiz v. Plá*, supra, pág. 647, dijimos que las razones principales dadas en estos estados para no conceder indemnización alguna por el costo de manutención del niño han sido:

"...que se considera que los beneficios emocionales que el niño le provee a sus padres exceden la carga económica que conlleva su crianza y que por razones de política pública no puede decirse que sufren daños los padres por el nacimiento y la crianza de un niño. Otros fundamentos esbozados en la jurisprudencia para apoyar dicha postura son: se promueve la estabilidad emocional de la familia al evitarle al niño el trauma sicológico de no ser querido y haber sido criado con dinero de un tercero; se evitan reclamaciones fraudulentas, y estos daños son especulativos. *Beardsley v. Wierdsma*, supra."

En sólo ocho (8) estados se ha permitido la compensación por los costos de manutención. Véanse: *University of Ariz. v. Superior Court*, 667 P.2d 1294 (Ariz. 1983); *Custodio v. Bauer*, 59 Cal.Rptr. 463 (1967); *Ochs v. Borelli*, 445 A.2d 883 (1982); *Jones v. Malinowski*, 473 A.2d 429 (Md. 1984); *Burke v. Rivo*, 551 N.E.2d 1

el 16 de noviembre, el E.L.A. solicitó la desestimación de la misma reclamación e incorporó por referencia todos los argumentos esbozados por la U.P.R. en su solicitud de sentencia sumaria.

Luego de que el tribunal de instancia les concediera varias prórrogas, los demandantes se opusieron a que se dictara sentencia sumaria por entender que existía una controversia de hechos.

El 8 de enero de 1993 la U.P.R. compareció para solicitar que se aceptara su solicitud de sentencia sumaria como una hecha bajo la Regla 10.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III, y se dictara sentencia por las alegaciones. A los fines de que se resolviera la aludida controversia, la U.P.R., en su solicitud, estipuló como hechos ciertos que su personal médico le había realizado una operación de esterilización a la demandante, que ésta no había resultado exitosa y que la demandante había procreado un hijo "no deseado".

El 19 de enero de 1993 el tribunal de instancia determinó que no era "procedente conceder daños en casos como el presente por concepto de crianza y manutención del hijo"; desestimó la reclamación correspondiente a esa partida, y ordenó la continuación de los procedimientos relativos a las restantes reclamaciones.

---

(1990); *Sherlock v. Stillwater Clinic*, 260 N.W.2d 169 (1977); *Lovelace Medical Center v. Mendez*, 805 P.2d 603 (N.M. 1991); *Marciniak v. Lundborg*, 450 N.W.2d 243 (1990). Sin embargo, en una de estas jurisdicciones (el estado de Minnesota) esta doctrina recientemente ha sido objeto de duras críticas en decisiones que aunque no han revocado expresamente la decisión de *Sherlock v. Stillwater Clinic*, supra, claramente han cuestionado si ésta puede continuar en vigor a partir de la adopción en 1984 de ciertas disposiciones estatutarias relacionadas a controversias como la del caso de marras. Véanse: Minn. Stat. sec. 145.424; *Jevning v. Cichos*, 499 N.W.2d 515 (1993); *Hickman v. Group Health Plan, Inc.*, 396 N.W.2d 10 (1986).

Véanse, además: L.A. Podewils, *Traditional Tort Principles and Wrongful Conception Child-Rearing Damages*, 73 (Núm. 3) B.U.L. Rev. 407 (1993); P.J. Peters, Jr., *Rethinking Wrongful Life: Bridging the Boundary Between Tort and Family Law*, 67 (Núm. 2) Tul. L. Rev. 397 (1992); N. Block, *Wrongful Birth: The Avoidance of Consequences Doctrine in Mitigation of Damages*, 53 (Núm. 5) Fordham L. Rev. 1107 (1985); *Recoverability of Cost of Raising Normal, Healthy Child Born As Result of Physician's Negligence or Breach of Contract or Warranty*, 89 A.L.R.4th 632 (1991); *Medical Malpractice, and Measure and Element of Damages, in Connection with Sterilization or Birth Control Procedures*, 27 A.L.R.3d 906 (1969).

El 2 de febrero de 1993 los demandantes solicitaron reconsideración del dictamen emitido y le informaron al Tribunal, por primera vez, que el 30 de octubre de 1991 la demandante había dado a luz un hijo y que el recién nacido había sido diagnosticado posteriormente con una condición congénita conocida como *Amaurosis Congénita de Leber's*,[5] por lo que solicitaron una partida adicional de daños por los gastos especiales resultantes de esta condición. La solicitud fue denegada el 11 de febrero de 1993. Luego de que los demandantes presentaran una segunda moción de reconsideración, el 9 de marzo de 1993 el Tribunal a quo dictó la resolución siguiente:

> A la moción de reconsideración, no ha lugar. Las razones de política pública [que] impiden la concesión de gastos de manutención están también presentes en el caso de un niño impedido. Los daños emocionales adicionales de los padres como resultado del impedimento constituyen una partida separada. Anejo IX, pág. 59.

No conformes con esta resolución, el 11 de mayo de 1993 los demandantes presentaron ante nos una solicitud de revisión. Acogimos el recurso presentado como *certiorari*[6] mediante Resolución de 4 de junio de 1993 y lo remitimos al Tribunal de Apelaciones, Sección Norte, para su consideración. El 24 de agosto de 1993 el Tribunal de Ape-

---

[5] Los demandantes alegaron que ésta es una "condición genética que se adquiere a través de la madre que presenta atrofia del nervio oftálmico y degeneración de la retina con la consecuente pérdida de agudeza visual". Alegaron, además, que comúnmente dicha condición no se puede corregir mediante operación; que dichos pacientes son considerados legalmente ciegos porque su agudeza visual es de 20/400, y que un niño que padece de esta condición tiene problemas en el desarrollo de sus destrezas sicomotoras por su incapacidad de percibir la luz, sombras y figuras, lo que podría ocasionar un grado de retardación en el menor.

[6] Los demandados presentaron una oposición a que expidiéramos el auto de revisión por entender que la solicitud había sido presentada tardíamente y este Tribunal no tenía jurisdicción para entender en el asunto. No obstante lo alegado, tomando en consideración la naturaleza novel de la controversia resuelta por el Tribunal a quo y la etapa de los procedimientos en instancia, entendimos que el dictamen debía haber sido considerado como una resolución interlocutoria y no una "sentencia sumaria parcial", como erróneamente la tituló el tribunal. En vista de ello, y dada la importancia de la controversia, determinamos que existía justa causa para entender en el asunto. Por lo tanto, acogimos el recurso presentado como *certiorari*.

laciones revocó la resolución dictada en instancia y determinó que:

> de probarse la negligencia de los demandados y la relación causal, éstos deberán compensar a los padres demandantes por los costos ordinarios y especiales que conllevará la manutención, crianza y educación del niño. La regla del beneficio no se aplicará en este caso en cuanto a beneficios económicos, no obstante lo que pueda determinar el tribunal de primera instancia sobre los beneficios emocionales *vis[-á-]vis* los sufrimientos y angustias mentales.

Inconformes con esta determinación, la U.P.R. y el E.L.A. presentaron, oportunamente, ante nos sendas peticiones de *certiorari*. En sus recursos ambos demandados plantearon que:

> Erró el Honorable Tribunal de Apelaciones al resolver que, probada la negligencia del médico que ha practicado una esterilización fallida así como la relación causal, son daños compensables, entre otros:
> (1) El costo de crianza o manutención del hijo cuya procreación se intent[ó] evitar mediante la esterilización, y
> (2) los gastos especiales relacionados a una condición congénita que padece el hijo, aun cuando esa condición no es un riesgo previsible del procedimiento de esterilización. Petición de *certiorari*, pág. 4.

El 10 de diciembre de 1993, por voto unánime, expedimos el auto solicitado para revisar la sentencia dictada por el Tribunal de Apelaciones, Sección Norte. Por presentar la misma controversia, consolidamos ambos recursos. Habiendo comparecido las partes, pasamos ahora a resolver.

## II

*La cuestión del daño*

En Puerto Rico la responsabilidad civil por actos de mala práctica de la medicina, debidos a la impericia o negligencia de un facultativo, surge del Art. 1802 de nuestro Código Civil, *supra*. Véanse, además: *Ortega et al.*

*v. Pou et al.*, 135 D.P.R. 711 (1994); *Santiago Otero v. Méndez*, 135 D.P.R. 540 (1994); *Torres Ortiz v. Plá*, supra; *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639 (1988); *Medina Santiago v. Vélez*, 120 D.P.R. 380 (1988). De igual manera, una entidad dedicada al servicio de la salud responde por la negligencia o impericia de sus empleados bajo el Art. 1803 del Código Civil, 31 L.P.R.A. sec. 5142. Es decir, que la prestación de los servicios médicos, sin la debida diligencia, puede generar la responsabilidad civil del médico u hospital, en el supuesto de que la falta de diligencia imputada cause un daño. La norma que aplica a estos casos es que, para que nazca la responsabilidad civil médica, el promovente de la acción tiene que establecer la ocurrencia de un acto médico culposo o negligente, la producción de un daño real y la relación causal entre el acto médico y el daño sufrido.

En vista de que los aquí codemandados estipularon que actuaron con negligencia, para resolver la controversia que tenemos ante nos procede que determinemos, en primer lugar, *si los demandantes han sufrido un daño real dentro del significado del Art. 1802, supra.*

De lo contrario, no procedería la indemnización solicitada porque la acción que se insta al amparo de la responsabilidad civil médica, como cualquier otra que se inicie bajo el Art. 1802, *supra*, es de carácter estrictamente resarcitorio y existe únicamente si el acto negligente del demandado ocasionó un daño real. *Rodríguez Cancel v. A.E.E.*, 116 D.P.R. 443 (1985). El acto negligente, por sí solo, no le confiere al demandante una causa de pedir; la "reparación del daño" existe únicamente como medida del daño sufrido y no del grado de descuido o negligencia del demandado. *García Pagán v. Shiley Caribbean, etc.*, 122 D.P.R. 193, 205–206 (1988).[7]

---

[7] Es por eso que en Puerto Rico no existen las figuras de daños nominales o daños punitivos cuando el demandante puede probar la existencia de una conducta culposa o negligente pero no puede probar que haya sufrido daño real alguno. *Rivera v. Rossi*, 64 D.P.R. 718, 721 (1945).

 A. De ordinario, "nuestra jurisprudencia no distingue entre daños físicos, materiales o morales para efectos de resarcimiento" (*García Pagán v. Shiley Caribbean*, supra, págs. 205–206), puesto que hemos reconocido como " '[d]año' todo aquel menoscabo material o moral que sufre una persona, ya sea en sus bienes vitales naturales, ya sea en su propiedad o en su patrimonio ...". Ello, no obstante, antes de pasar al análisis de la controversia ante nos, cabe señalar que en relación con la responsabilidad civil médico-hospitalaria ya antes habíamos reconocido que, por la cuestión de los daños, algunos de estos casos "representan un reto especial para los jueces". *Pérez Torres v. Bladuell Ramos*, 120 D.P.R. 295, 297 (1988). Ello es así porque, aunque en casos de impericia médica se pueden reclamar todos los tipos de daños admitidos con carácter general para cualquier clase de responsabilidad civil, en estos casos adquieren particular pertinencia los daños corporales, ya que los servicios médicos tienen como objeto de su actividad el cuerpo humano, en los diversos aspectos que lo contempla el tratamiento médico-quirúrgico.

Por otro lado, los casos como el de marras, que surgen de una operación de esterilización, representan un reto para el proceso judicial, aún más intrincado que el de los casos ordinarios de mala práctica de la medicina. En los de esterilización, el objeto de la intervención del médico es el sistema reproductivo humano y el propósito de esa intervención no es, en la mayoría de los casos, de carácter terapéutico o curativo, sino el de inhibir la capacidad reproductiva del paciente, por voluntad propia. Por ello, estos casos inevitablemente implican criterios de alto contenido moral y sicológico, incluso fundamentales valores religiosos, que ocasionan complejas controversias, tales como el uso de las operaciones de esterilización como método contraceptivo, la reproducción humana, la planificación familiar, la adopción y las relaciones filiatorias.

■ Al enfrentarse a este tipo de acción por primera vez, en *Torres Ortiz v. Plá*, supra, este Tribunal determinó que no existían diferencias entre una acción entablada como resultado de la práctica negligente de una operación de esterilización y las demás acciones que comúnmente se instan por mala práctica de la medicina, que justificaran exigirle a los médicos que hacen estas operaciones un menor grado de cuidado que el requerido a los demás médicos cirujanos. Se dijo allí, que hubiese resultado indeseable inmunizar a estos profesionales de la responsabilidad de reparar el agravio causado por su negligencia. Por ello, en aquella ocasión, se confirmó la concesión de daños hecha por el foro sentenciador y se resolvió que éste había actuado correctamente al conceder indemnización por los daños relacionados con la intervención médico-quirúrgica negligente, con la segunda operación de esterilización que fue necesaria para corregir los defectos de la primera y con el parto, incluyendo los gastos médicos y hospitalarios, los múltiples sufrimientos físicos y angustias mentales de los demandantes ocasionados por las referidas intervenciones médico-quirúrgicas y por el inesperado embarazo de la paciente, y los ingresos dejados de percibir durante el tiempo en que ésta no pudo trabajar. Nada de lo que resolveremos aquí altera lo establecido en *Torres Ortiz v. Plá*, supra.

Pasemos ahora a determinar si en el caso ante nos existe un daño indemnizable.

B. Los demandantes alegan que habrán de sufrir un daño patrimonial equivalente a los costos de mantener y educar al hijo nacido posteriormente a la operación de esterilización. Alegan que su intención de evitar el nacimiento de este hijo fue frustrada por la negligencia de los demandados y que, por lo tanto, los demandados deben indemnizarle por los gastos en que incurrirán para educar, alimentar y criar a su hijo mientras éste sea menor de edad y por los gastos especiales relacionados con la incapacidad del niño producto de su condición congénita.

■ En *Torres Ortiz v. Plá*, supra, el tribunal de instancia concedió *únicamente* aquellos daños morales y patrimoniales que estaban relacionados con el embarazo, el parto y las operaciones de esterilización. Los demandantes en el caso ante nos ahora también solicitan indemnización por el costo de *mantener y educar* a su hijo. Esta reclamación no está relacionada directamente con las intervenciones médico-quirúrgicas, sino propiamente con el deber de sostener y criar al niño, que surge primordialmente de la responsabilidad jurídica y moral que tienen en nuestra sociedad *todos* los padres en relación con sus hijos. La reclamación que ostentan los demandantes hoy es, pues, cualitativamente distinta de las reclamaciones que hemos tenido ante nos anteriormente.

■ Aunque en nuestra jurisprudencia no se ha formulado una definición integral de "daño", capaz de abarcar la diversidad de matices que dicho concepto tiene, connotados en numerosas decisiones judiciales, es claro que para que ocurra un daño real indemnizable bajo el Art. 1802, *supra*, tienen que concurrir tres (3) elementos esenciales. Dos (2) de ellos, que están relacionados propiamente con el daño en sí, son: (1) que el daño ha de causar una lesión, pérdida o menoscabo, y (2) que éste ha de recaer sobre bienes o intereses jurídicos de una persona. El tercero es que el daño ha de ser resarcible de alguna forma. J. Santos Briz, *La responsabilidad civil*, 6ta ed., Madrid, Ed. Montecorvo, 1991.

En el caso ante nos *no* concurren los aludidos elementos que son necesarios para que se configure un daño indemnizable. Ello surge de modo patente al ponderar cuál es la verdadera naturaleza del "daño" reclamado por los demandantes. Estos aducen que el daño por el cual solicitan indemnización no es el nacimiento o la existencia del hijo en sí, sino el menoscabo patrimonial que sufrirá su familia a consecuencia de la carga económica que conlleva-

ría la crianza de éste. Esta distinción es insostenible y apareja, además, una seria distorsión de los fundamentales valores jurídicos pertinentes.

■■■■ Dentro de nuestro ordenamiento jurídico, para poder designar como "daño compensable" la responsabilidad de los padres de mantener y criar a un hijo suyo, tendríamos que caracterizar la vida del niño desde que nace y mientras dependa de sus padres como un daño en sí. Tal caracterización sería inevitable porque aunque la obligación que tienen los padres de alimentar a los hijos es exigible por imperativo del vínculo familiar existente entre ellos, dicha obligación tiene su fundamento radical en el derecho de los hijos a la vida. Véanse: *Negrón Rivera y Bonilla, Ex parte*, 120 D.P.R. 61 (1987); *Martínez Rivera v. Rivera Hernández*, 116 D.P.R. 164, 168 (1985); *Milán Rodríguez v. Muñoz*, 110 D.P.R. 610 (1981). Es porque el hijo tiene derecho al desarrollo de su vida, según sus facultades, que sus padres tienen la obligación moral y jurídica de procurarle los medios necesarios para su manutención. Son éstas concomitantes inseparables del esquema jurídico sobre las personas. No se podría concebir la obligación familiar de alimentar como una "carga económica" o como un "daño compensable" sin reducir igualmente el derecho al pleno desarrollo de la vida del hijo a tales categorías.

■■■■ En ocasiones anteriores nos hemos visto obligados a realizar la angustiosa tarea de dilucidar la procedencia de daños en virtud de razonamientos dirigidos a evaluar la vida de un hijo en términos monetarios. Así, pues, en nuestra jurisprudencia se le ha reconocido una causa de acción, bajo el Art. 1802, *supra*, a los padres de un hijo cuya muerte haya sido causada por un acto culposo o negligente de un tercero. Véanse: *Zeno Molina v. Vázquez Rosario*, 106 D.P.R. 324 (1977); *Travieso v. Del Toro y Travieso, Int.*, 74 D.P.R. 1009 (1953); *Orta v. P.R. Railway, L.*

*& P. Co.*, 36 D.P.R. 743 (1927).([8]) Por otro lado, en ocasión del nacimiento de un hijo, hemos aprobado la indemnización de daños prenatales resultantes del acto negligente de un médico. *Riley v. Rodríguez de Pacheco*, 119 D.P.R. 762 (1987); *Rodríguez v. A.A.A.*, 98 D.P.R. 872 (1970).

Pero, nótese, que estas decisiones han estado fundamentadas, en gran medida, en la idea de que dentro de la jerarquía de valores que informa a nuestro ordenamiento sociojurídico, la vida humana es el valor más importante sobre el cual descansan todos los demás derechos y deberes de nuestros ciudadanos y sin el cual todos ellos resultarían baldíos. La *pérdida* de la vida humana, o el *daño a ésta*, son resarcibles, pues, como la pérdida o lesión del bien jurídico más importante.

▄▄▄ Resolver ahora que el derecho de un hijo al pleno desarrollo de su vida puede constituir un "daño" para los padres, no sólo le impondría a nuestro sistema judicial la tarea denigrante de evaluar el valor inconmesurable de una vida humana de acuerdo con la carga económica que pueda representar para los padres sino que, además, requeriría predicar la acción en cuestión, irónicamente, en la existencia misma de la vida humana, en la tenencia del bien jurídico de mayor importancia en nuestro ordenamiento y no, como lo hemos hecho tradicionalmente, en actos que causan su pérdida o lesión. No creemos que haya cabida para ello dentro del esquema del Art. 1802 del Código Civil, *supra*. En términos jurídicos, pues, los demandantes en el caso de marras no pueden alegar que hayan sufrido un daño indemnizable.

▄▄▄▄ No ignoramos que para la mayoría de las fa-

---

([8]) En estos casos, incluso, hemos reconocido que procede la compensación a los padres por la pérdida de los beneficios inherentes a su relación con el hijo fallecido. *Zeno Molina v. Vázquez Rosario*, 106 D.P.R. 324 (1977); *Travieso v. Railway*, L. & P. Co., 36 D.P.R. 743 (1927). Más recientemente hemos aplicado la doctrina de "dependencia económica" para evitar la concesión de daños excesivamente especulativos. *Pate v. U.S.A.*, 120 D.P.R. 566 (1988). Ello, no obstante, la doctrina aludida continúa en pleno vigor.

milias puertorriqueñas su situación económica frecuentemente es fuente de intensa ansiedad, arduo trabajo e innumerables sinsabores. Precisamente, es por el gran sacrificio que conlleva la paternidad que nuestro ordenamiento jurídico, fuera de ciertas excepciones dirigidas a asegurar el bienestar del menor, le confiere a los padres determinados derechos y prerrogativas respecto a la crianza y trato de sus hijos que no tienen comparación con ninguna otra de las relaciones humanas reguladas jurídicamente. Los hijos se consideran la extensión del padre y la madre; forman parte de su patrimonio moral. La familia siempre ha tenido y continuará teniendo, sin importar los avances tecnológicos que puedan surgir en el área de la medicina reproductiva, la responsabilidad por la creación, formación y conservación de la vida humana de los hijos —gesta sin par en la capacidad creadora del ser humano. Si tratásemos esa responsabilidad como un daño, irremediablemente le estaríamos restando valor a la vida humana que resulte de ella. Si la configuramos como un evento dañoso o uno que tenga el potencial de generar daños compensables, atestaríamos un golpe detrimental al fundamental conjunto de valores que encarna nuestro sistema jurídico. Sencillamente, no podemos considerar el derecho de un niño a vivir y desarrollarse como "daños compensables".([9])

---

([9]) Los demandantes plantearon en su alegato, además, que tenían un interés en emplear la aludida operación como método contraceptivo y de planificación familiar; que dicho interés estaba protegido por su derecho constitucional a la protección de su intimidad, y que resolver que no procede la indemnización solicitada sería inconstitucional porque establecería una norma que limitaría o menoscabaría el derecho a la intimidad protegido por nuestra Constitución y la decisión del Tribunal Supremo federal en el caso de *Roe v. Wade*, 410 U.S. 113 (1973), adoptada en *Pueblo v. Duarte Mendoza*, 109 D.P.R. 596 (1980).

Los demandados oportunamente se opusieron a estos planteamientos por entender que no se habían presentado propiamente ante los tribunales de instancia y de Apelaciones. Tienen razón. Ello, no obstante, puesto que esta controversia fue discutida en la sentencia dictada por el Tribunal de Apelaciones, cabe señalar que estos planteamientos son claramente inmeritorios.

En el caso de marras no existe ninguna controversia de la índole planteada por los demandantes, puesto que los daños reclamados por éstos surgen precisamente después del nacimiento de un hijo, etapa claramente posterior a la considerada en la

## III

*La cuestión de la causalidad*

■ Para que exista responsabilidad civil médico-hospitalaria, además de negligencia y de un daño indemnizable, debe existir causalidad; es decir, la parte demandante tiene que probar que la conducta del facultativo fue el factor que con mayor probabilidad ocasionó el daño y establecer la relación de causa y efecto entre ambos. *Ramos, Escobales v. García, González*, 134 D.P.R. 969 (1993), *Castro Ortiz v. Mun. de Carolina*, 134 D.P.R. 783 (1994); *Torres Ortiz v. Plá*, supra; *Rodríguez Crespo v. Hernández*, supra.

Aunque en el caso de marras resolvemos que los demandantes no han sufrido un daño indemnizable, y por lo tanto no cumplen con uno de los elementos esenciales del citado Art. 1802 del Código Civil, es menester que nos pronunciemos sobre la cuestión de la relación causal ahora, porque la reclamación de los demandantes estuvo claramente fundamentada en una visión errada de este concepto y del al-

---

decisión de *Roe v. Wade*, supra. No cabe hablar del derecho constitucionalmente protegido de utilizar métodos contraceptivos cuando el hijo que se deseaba evitar ya ha nacido.

Por otro lado, la acción que éstos han presentado es una ordinaria de daños y perjuicios por impericia médica. Sabido es que los derechos garantizados por la Constitución pueden invocarse, como regla general, frente a una acción ilícita del Gobierno, no de ciudadanos privados. *Pueblo v. Rosario Igartúa*, 129 D.P.R. 1055 (1992). Anteriormente hemos reconocido que una lesión al derecho de intimidad de un ciudadano, por parte de otro, puede dar lugar a una acción en daños y, en lo posible, hemos protegido su ejercicio libre de interferencias de terceros. Sin embargo, como los demandantes no han planteado ninguna violación al derecho a la intimidad de parte del médico negligente, para que exista una "norma inconstitucional", como alegan los demandantes, tendría que existir una acción correspondiente del Estado que, de alguna forma, restrinja o limite ilegalmente un derecho de los ciudadanos. Conforme a la decisión del Tribunal Supremo federal en el caso de *Roe v. Wade*, supra, y su progenie, los demandantes, bajo ciertas circunstancias, tienen la libertad de someterse a este tipo de operación de esterilización. Sin embargo, ello no implica que el Estado garantice absolutamente la calidad de los servicios que reciba. Nada de lo que resolvemos hoy limita, de forma alguna, la opción que tienen los que interesen utilizar el aludido método contraceptivo y otros legalmente disponibles, conforme las normas y doctrinas sobre el particular establecidas por el Tribunal Supremo de Estados Unidos, que estamos obligados a seguir.

cance de nuestra decisión en el caso de *Torres Ortiz v. Plá*, supra.([10])

■ En Puerto Rico rige la doctrina de causalidad adecuada. Conforme a ella, no es "causa" toda condición sin la cual no se hubiese producido el resultado, sino aquella que según la experiencia general ordinariamente lo produce. *Negrón García v. Noriega Ortiz*, 117 D.P.R. 570 (1986); *Jiménez v. Pelegrina Espinet*, 112 D.P.R. 700 (1982); *Soc. de Gananciales v. Jerónimo Corp.*, 103 D.P.R. 127 (1974). Para establecer la relación causal necesaria no es suficiente que un hecho aparente ser condición de un evento, si éste regularmente no trae aparejado ese resultado. *Ortiz Torres v. K & A Developers, Inc.*, 136 D.P.R. 192 (1994); *Rivera Jiménez v. Garrido & Co., Inc.*, 134 D.P.R. 840 (1993). Esta normativa ha sido fundamentalmente desarrollada con el propósito de limitar la responsabilidad civil a aquellos casos en que la ocurrencia de un hecho dañoso sea imputable moralmente a su alegado autor, porque éste era una consecuencia previsible o voluntaria del acto negligente. Nada de lo que dijimos en *Torres Ortiz v. Plá*, supra, alteró esta norma. Para que exista la responsabilidad civil del médico u hospital en el caso de marras no basta con que los demandantes prueben la ocurrencia del acto médico negligente, sino que tienen que demostrar que existe una razón suficiente para que la carga económica de mantener al hijo nacido posteriormente sea concretamente imputable a ese acto negligente en particular. Debe existir un vínculo jurídico tal que legitime que el alegado daño sea atribuible al médico y su patrimonio. Véanse: J. Fernández Costales, *La responsabilidad civil médica y hospitalaria*, Madrid, Ed. Edilex,

---

([10]) En la moción de reconsideración presentada ante el tribunal de instancia los demandantes plantearon que no aplicaba la norma adoptada por la mayoría de las jurisdicciones estatales anunciada en *Torres Ortiz v. Plá*, supra, porque ésta sólo aplicaba a casos en que el hijo no deseado naciera saludable y no a bebés nacidos con defectos congénitos.

318

1987; J. Ortiz López, *Los médicos y la responsabilidad civil*, Madrid, Ed. Montecorvo, 1985.

 Desde el punto de vista conceptual, la cuestión de la causalidad es un problema esencialmente de imputabilidad. Para que exista causalidad, el daño ha de existir en razón de la conducta del demandado; es decir, tiene que ser concretamente atribuible a la acción o conducta humana imputada. Al respecto, nos dice Santos Briz que la cuestión de la causa adecuada está "en determinar si la conducta del individuo es generalmente apropiada para producir un resultado de la clase dada". Santos Briz, *op. cit.*, pág. 239. Por lo que, aun cuando concurran varias causas, no puede considerarse aisladamente la mera sucesión de acontecimientos, sino que hay que tener en cuenta qué causa es la decisiva, que por sus circunstancias ocasiona el daño, y justifica que se le impute el mismo a alguien en particular. Véanse: *Cárdenas Maxán v. Rodríguez Rodríguez*, 125 D.P.R. 702 (1990); *Valle v. American Inter. Ins. Co.*, 108 D.P.R. 692, 697 (1979); Santos Briz, *op.cit.* La causa tiene que ser directa o indirectamente "productora" del evento dañoso. *Toro Lugo v. Ortiz Martínez*, 113 D.P.R. 56, 57 (1982).

 En el caso ante nos, la actividad médica en cuestión —la operación de esterilización— tenía el propósito de hacer infecunda a la demandante Dominga Soto Cabral. La negligencia del médico causó que el tratamiento no fuese efectivo, por lo que el médico, pudiendo haber evitado sustancialmente la posibilidad de concepción de la demandante, por su negligencia, no lo hizo. *¿Quiere ello decir que dicha negligencia fue también la causa no sólo del nacimiento del hijo sino, más importante aún, de su posterior desarrollo como ser humano?* Nótese que la reclamación que hace la parte demandante es por los costos de manutención y crianza del hijo, por lo que debemos indagar si puede concluirse jurídicamente que tales costos específicos fueron causados por la impericia médica, conforme las re-

feridas normas y conceptos sobre causalidad adecuada.(11) Lo que propiamente nos incumbe, pues, es la cuestión de si puede imputársele a la negligencia del médico en este caso la necesidad de alimentar y educar al menor, por haber sido esa necesidad producto de dicha negligencia. Respecto a esta cuestión, resolvemos que ello no es de modo alguno atribuible causalmente a la referida impericia médica. Re-

---

(11) Al menos en términos de inmediatez o proximidad, podría cuestionarse incluso si el propio nacimiento del hijo es en sí realmente atribuible a la negligencia médica de este caso. El nacimiento del hijo, propiamente hablando, fue el resultado del proceso natural de procreación que se originó por razón de las relaciones sexuales de sus padres. Por lo tanto, no fue la impericia médica la causa *inmediata* del nacimiento del niño. En ese sentido, este caso es diferente de otros de mala práctica de la medicina en que la intervención quirúrgica solicitada por el paciente tiene el propósito de interrumpir el proceso natural de una enfermedad, la cual el paciente ya padece al momento de solicitar la intervención médica. En tales casos, la negligencia del médico da lugar a responsabilidad civil por daños causados por la enfermedad si el facultativo en cuestión tenía la obligación de interrumpir el proceso natural de la enfermedad y no lo hizo o la empeoró, bien por omisión o por negligencia. En el caso de marras, por el contrario, el proceso natural que llevó al nacimiento comenzó con posterioridad a la intervención médica y fue iniciado por los actos de los demandantes, como resultado de las relaciones sexuales que ambos padres desearon sostener. Desde este punto de vista, la causa próxima o inmediata, sin la cual el nacimiento no hubiese sido posible fue, pues, el acto sexual entre los demandantes, no el acto negligente del médico.

Sin embargo, no es menester resolver jurídicamente si el nacimiento del hijo en sí fue "causado" o no por la impericia médica en la operación de esterilización, ya que no es ese el asunto realmente ante nos, y hacerlo nos pondría, innecesariamente, en la espinosa y a veces estéril controversia sobre cuál es el concepto o la definición más correcta de causalidad y sobre la pertinencia de las teorías o doctrinas sobre "causa próxima", "causa legal", "causa eficiente", "causa fáctica" y otras. Véase H.M. Brau Del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, San Juan, Pubs. J.T.S., 1986, Vol. II, págs. 663–729; J.A. Cuevas Segarra, *La responsabilidad civil y el daño extracontractal en Puerto Rico*, San Juan, Pubs. J.T.S., 1993, págs. 93–101. Como bien ha señalado Brau Del Toro, "tanto la doctrina de la causa próxima como la de causalidad adecuada están definidas por expresiones sumamente amplias, abarcadoras y flexibles, y por ello, serán los tribunales que las apliquen quienes habrán de perfilarlas y darles contenido específico. En esa gestión ejercerán una influencia determinante valores mucho más importantes y fundamentales que unos criterios y factores técnico-jurídicos cuyo uso puede reconocerse en la aplicación de tales doctrinas. Entre dichos valores se cuentan el sentido de justicia, equidad, respeto a la dignidad del ser humano, libertad, democracia y sus instituciones. Distintas jurisdicciones donde prevalezca la misma doctrina, ya de causa próxima ya de causalidad adecuada, pueden llegar a resultados relativamente distantes según la interpretación y la acotación de dichas doctrinas estén guiada[s] en diversa medida por los aludidos valores". (Énfasis suprimido.) Brau Del Toro, *op. cit.*, pág. 715.

Además, como ya hemos señalado, todo lo resuelto en *Torres Ortiz v. Plá*, supra, sigue vigente. No queremos, pues, resolver un asunto que pueda dar la impresión de que dejamos sin efecto la responsabilidad del médico negligente por los costos del parto indeseado.

solvemos así por razón del hecho innegable de que, después de nacido el hijo, aunque éste no había sido deseado, *los padres decidieron quedarse con él*. La determinación de los padres de mantener al hijo en su compañía y de criarlo es obviamente la causa adecuada de los costos que han de incurrir para su alimentación y educación. Fue esa determinación de los padres de retener la custodia y ejercer su patria potestad sobre el menor lo que dio lugar a que éstos tuviesen que encarar la necesidad de costear los gastos de manutención y crianza del hijo, puesto que, como discutiremos posteriormente, la responsabilidad económica por las necesidades de los hijos es uno de los deberes que impone la patria potestad, inseparable de los demás. No puede ejercerse lo uno sin hacerse responsable por lo otro. Fue la propia decisión de los padres, pues, la que claramente ocasionó lo que ellos aquí alegan ser un "daño" indemnizable.

Esta determinación que hacemos sobre la falta de nexo causal es cónsona con lo que se ha resuelto en varias de las jurisdicciones estatales que han tratado este tema. En dichas jurisdicciones se ha decidido que aun de existir una relación causal entre la negligencia del médico y el mantenimiento del hijo, *ésta es demasiado remota*. Se estima que la causa de los costos de manutención del recién nacido no es la negligencia del médico, sino el hecho de que los padres, en la etapa posterior al parto, *decidieron criar al niño, en lugar de darlo en adopción*. Dicha doctrina está fundamentada en la noción de que los padres pierden el derecho de solicitar indemnización por los costos de manutención y crianza del hijo por no escoger *la alternativa de la adopción*, que implícitamente les ofreció el Estado para beneficio del menor y la cual no conllevaba la carga económica que los padres alegadamente deseaban evitar. Esta noción también ha servido de fundamento para que en la mayoría de estas jurisdicciones se haya resuelto, como

cuestión de derecho, que existe una presunción irrebatible de que los sentimientos de afecto de los padres hacia la criatura, junto con los importantes beneficios intangibles resultantes de la vida humana y de la relación paterno-filial, sobrepasan la carga económica que apareja la crianza de un hijo y que, es por ello, que los padres deciden mantener al hijo en su compañía en lugar de darlo en adopción. Finalmente, en las jurisdicciones aludidas se considera que conceder indemnización por los costos de manutención representaría un enriquecimiento injusto para los padres, ya que recibirían todos los beneficios inherentes a la relación filiatoria sin tener que incurrir en los gastos económicos que de ordinario ésta conlleva.(12) Véanse: *Wilbur v. Kerr*, 628 S.W.2d 568, 571 (1982); *Flowers v. District of Columbia*, 478 A.2d 1073, 1077 (1984); *Fassoulas v. Ramey*, 450 So. 2d 822 (1984); *Cockrum v. Baumgartner*, 447 N.E.2d 385 (1983); *Girdley v. Coats*, 825 S.W.2d 295, 297–298 (1992); *O'Toole v. Greenberg*, 477 N.E.2d 445, 448 (1985).

---

(12) Es menester señalar que existen otros fundamentos que consolidan nuestra determinación de que no existe el elemento de causalidad en este caso. Así, pues, sería a la vez altamente *especulativo e incongruente* determinar judicialmente el alcance y la magnitud causal del alegado "daño". Mucho más que lo que ocurre en otras situaciones donde también es incierto el alcance de lo causado —como la de lucro cesante— en este caso existen elementos aleatorios que hacen muy dudosa la tarea de predecir hasta donde llegan los daños. Las necesidades de un hijo a través de las distintas etapas de su crecimiento y desarrollo pueden variar substancialmente por razón de muchos factores que no son conocidos ni anticipables al momento del nacimiento. No se trata únicamente de la cuestión de prever lo desconocido, sino, además, de la de imputar lo fortuito. Por ejemplo, si resultara que el niño tuviera particular talento intelectual, artístico o de otra índole, de modo que procediera darle educación especial, ¿sería ello atribuible causalmente al médico negligente? Si en cambio se tratase de un niño que resulta ser enfermizo, que requiere atención especial, ¿sería ello imputable a la impericia en cuestión? ¿Qué sucede si el menor fallece antes de lo anticipable? Estas y otras interrogantes que podrían levantarse ponen de manifiesto lo anómalo que es suponer que un médico que realiza una esterilización negligentemente es por ello causalmente responsable de la crianza del menor. Véanse: *Boone v. Mullendore*, supra, pág. 722; *Coleman v. Garrison*, supra, pág. 12.

## IV

*Consideraciones de orden público*

A. La controversia que tenemos ante nos hoy debe considerarse también a la luz del alto interés que tiene el Estado en preservar la estabilidad y la integridad de la familia, y de otros importantes valores protegidos por la política pública del país sobre el particular que forman parte integral de nuestro ordenamiento jurídico.

En Puerto Rico la integridad de la familia, la institución de la patria potestad y las buenas relaciones filiatorias gozan todas de la más alta protección jurídica. En la jurisprudencia reciente de este Tribunal abundan ejemplos de las diferentes manifestaciones de esta política estatal. Véanse: *Pueblo en interés menores R.P.S. et al.*, 134 D.P.R. 123 (1993); *Calo Morales v. Cartagena Calo*, 129 D.P.R. 102 (1991); *Almodóvar v. Méndez Román*, 125 D.P.R. 218 (1990); *García v. Acevedo*, 123 D.P.R. 624 (1989). Por otro lado, en materia de daños, de modo excepcional, reiteradamente hemos rehusado aplicar el citado Art. 1802 del Código Civil cuando se han entablado acciones que atentarían contra esta política pública. *Romero Soto v. Morales Laboy*, 134 D.P.R. 734 (1993); *Martínez v. McDougal*, 133 D.P.R. 228 (1993); *Guerra v. Ortiz*, 71 D.P.R. 613 (1950). Véanse, además: *Drahus v. Nationwide Mutual Ins. Co.*, 104 D.P.R. 60 (1975); *Fournier v. Fournier*, 78 D.P.R. 430 (1955). El deber que le impone a los padres el Art. 153 del Código Civil, 31 L.P.R.A. sec. 601, de alimentar, educar y criar a sus hijos, es parte esencial de la aludida política pública. Ese deber, concomitante inseparable de la patria potestad que tienen los padres sobre los hijos, es una consecuencia inherente a la condición de ser padre o madre y existe con todos sus efectos patrimoniales, jurídicos y morales, desde el momento en que nace el hijo, irrespectivo de las circunstancias de su nacimiento.

En la doctrina civilista moderna, de la cual proviene nuestro Derecho en materia de familia, las figuras del padre y de la madre se conciben no como las de dueño o señor de los hijos, sino más bien como las de un amoroso protector. Este concepto de los padres está fundamentado en el principio de que, para que nuestra sociedad pueda permanecer en armonía con las leyes naturales, los padres están obligados

> a sacrificarse por sus hijos, a procurar su felicidad, a cuidar de su educación, de su desarrollo moral, intelectual y físico, y a prepararlos, en suma, para asumir las eventualidades y responsabilidades del porvenir, en el seno de la familia y en el campo más amplio de la sociedad. *Llopart v. Mesorana*, 49 D.P.R. 250, 254 (1935).

La prioridad que tienen estos deberes por encima de los derechos que tienen los padres sobre la persona y los bienes de los hijos es lo que nos ha llevado a reiterar en repetidas ocasiones que la institución de la patria potestad en nuestro ordenamiento jurídico existe para beneficio del hijo y no para provecho del padre. *Llopart v. Mesorana*, supra, pág. 258. Es por ello que tradicionalmente hemos exigido que la patria potestad se ejerza *integralmente* y no como un conjunto de derechos y deberes individuales e independientes. Su ejercicio en conjunto es lo que promueve la paz y estabilidad en la familia. Así se ha señalado en la doctrina al definir las características esenciales de la patria potestad:

> ...en primer término, la de ser *imprescriptible*, porque el no uso o el abandono podrá imponer sanciones al padre pero no lo libera de sus funciones de padre con relación a los hijos; es, por otra parte, *intransferible*, porque el padre o la madre no pueden voluntariamente ceder esos deberes fundamentales de la vida familiar a nadie en virtud de ninguna razón; de igual manera es *inalienable*, porque a nadie se le puede traspasar por ningún concepto o motivo, ni por ningún interés; y, por último, es *irrenunciable* [, excepto en aquellos casos de adopción dispuestos por ley para beneficio del menor]. (Énfasis suplido.) E. Menén-

dez, *Lecciones de Derecho de Familia*, Río Piedras, Ed. Universitaria, 1976, pág. 322.

La reclamación de los demandantes evidentemente no puede sostenerse a la luz de los fundamentales valores y concepciones jurídicas de la referida política pública. De permitirse la reclamación de los demandantes que tenemos ante nos, se menoscabaría la fundamental noción axiológica antes aludida de que la paternidad significa sacrificios, y se debilitaría la integridad de la institución de la patria potestad y de su configuración como un *conjunto inseparable*, tanto de derechos como de *obligaciones*, que es inalienable, intransferible e irrenunciable.

Los demandantes alegan que su reclamación por los costos de manutención del menor no equivale a una abdicación de sus responsabilidades en relación con el niño. Aducen que existe una diferencia esencial entre el contenido económico y el contenido moral de las responsabilidades impuestas por la patria potestad, y que el separarlos mediante una acción litigiosa de daños no causaría detrimento a la política del Estado de proteger la unidad familiar. Sugieren, además, que en aquellos casos en que el nacimiento de un hijo no haya podido ser evitado debido a la negligencia de un médico, la "justicia" exige que la carga económica que los padres intentaron evitar mediante la operación de esterilización sea transferida al médico o a la institución hospitalaria responsable, para que de esa manera los padres puedan desempeñar adecuadamente su responsabilidad "moral" de mantener al niño en su compañía, educarlo, instruirlo, alimentarlo y atenderlo. No tienen razón.

■ El componente económico de las responsabilidades inherentes a la patria potestad no puede separarse de los otros componentes sin atentar seriamente, a la vez, contra la legitimidad de esa patria potestad. El derecho que tienen los hijos a que sus padres le provean alimentos y demás necesidades esenciales para su educación y desa-

rrollo lo establece directamente el ordenamiento jurídico, porque la sociedad lo ha reconocido como necesario para la paz e integridad de nuestra convivencia social. Este derecho está fundamentado en la esencial noción de que la carga económica que representa la crianza de un menor debe recaer primordialmente sobre aquellos con los cuales el menor comparta lazos familiares, ya sean biológicos o de afecto, y que el deber de alimentar a los hijos queda irrevocablemente establecido una vez se establece el lazo filiatorio.

En ese sentido, las obligaciones legales de los padres en relación con sus hijos están revestidas del más alto interés público. Su adecuado cumplimiento es precisamente lo que fomenta que la familia pueda desarrollarse dentro de un ambiente estable. Proveer los bienes materiales necesarios para el crecimiento y desarrollo decoroso de los hijos es lo que sienta los fundamentos para unas relaciones filiatorias seguras y estables.[13] Por ello, el deber jurídico de alimentar a los hijos se considera una "primordial obligación cuyo cumplimiento debe exigirse con el mayor rigor" (*Rodríguez Sanabria v. Soler Vargas*, 135 D.P.R. 779 (1994); *Negrón Rivera y Bonilla, Ex parte*, supra; *Martínez Rivera v. Rivera Hernández*, supra); al extremo de que el incumplimiento con esos deberes sujeta a los padres a acciones criminales (Arts. 158, 160 y 164 del Código Penal, 33 L.P.R.A. secs. 4241, 4242 y 4247, respectivamente; Arts. 118, 119 y 125 del Código Civil, 31 L.P.R.A. secs. 466, 481 y 504, respectivamente; *Calo Morales v. Cartagena Calo*, supra, pág. 118. En el caso de marras, los demandantes pretenden que esa obligación sea cumplida por el mé-

---

[13] Al respecto, el Art. 3 de la Ley de Protección a Menores, Ley Núm. 75 de 28 de mayo de 1980 (8 L.P.R.A. sec. 403), declara como política pública del Estado el

"...velar por que todos los menores de Puerto Rico tengan la oportunidad de lograr un óptimo desarrollo físico, mental, emocional y espiritual. Forma parte de esta política pública el reconocimiento de la autonomía paterna en la crianza de los hijos, ya que el hogar es el medio por excelencia para lograr el óptimo desarrollo de un niño."

dico demandado, quien no guarda relación alguna con el menor, en virtud de una alegada relación causal entre la negligencia médica y los costos de la crianza del niño. No es difícil concebir cómo quedaría entonces la autoridad moral de los padres respecto a este hijo. Los intentos de los padres por modelar la conducta del menor, sus esfuerzos por darle dirección y sentido a su vida temprana, por aconsejarle y aun disciplinarle cuando sea menester, estarán siempre *lastrados* sicológica e intelectualmente por el hecho debilitante de que quien *mantiene* al hijo, quien le procura sus alimentos con el sudor de su frente, no son los padres, sino un extraño.

Es, además, eje central de nuestro ordenamiento jurídico en materia de familia, que sean los padres los que tengan y cumplan primordialmente la obligación de proveer a sus hijos las necesidades esenciales a su crianza, sea el hijo deseado o no. Véanse: *Almodóvar v. Méndez Román*, supra; *Ocasio v. Díaz*, 88 D.P.R. 676 (1963). Este principio debe aplicar aquí con igual fuerza porque, sin importar la negligencia de los demandados en la cirugía de esterilización, el menor seguirá siendo hijo suyo, nunca del médico. Por ello, la responsabilidad jurídica y moral de mantener al hijo tiene que seguir siendo de los padres, no de éste. Es por ello también que debemos evitar, en lo posible, que los padres utilicen un procedimiento litigioso para obligar a un tercero a satisfacer los costos de crianza de su hijo. De lo contrario se crearía una figura anómala de "padre ausente" por la cual el médico sería responsable del costo total de la crianza del menor, mientras que los padres biológicos retendrían al niño en su compañía. Ello tendría un efecto devastadoramente desestabilizador para las familias puertorriqueñas, menoscabaría la autonomía y la autoridad de los padres en la crianza de sus hijos y podría denigrar las figuras del padre y la madre en nuestra sociedad.

Manresa ha explicado que mantener a los hijos

en su compañía "es un derecho que corresponde a los padres para cumplir con acierto [sus] obligaciones" de alimentarlo, criarlo y educarlo. Manresa, citado en *Llopart v. Mesorana*, supra, pág. 259.[14] En efecto, nuestro Código Civil y nuestra jurisprudencia establecen que el mantenimiento y el cuidado de los hijos son el deber primordial de los padres y su compañía es la manera de asegurar su cumplimiento adecuado. Todo ello revela que la responsabilidad económica de mantener a los hijos es incuestionablemente una *parte esencial e integral* de las responsabilidades jurídicas de los padres. Es intransmisible e indelegable. No debe ser exigido a un tercero extraño, con el cual el menor en cuestión no comparte lazos familiares ni afectivos. A fin de cuentas, sólo a los padres, y al Estado en su ausencia o defecto, se les puede exigir el cumplimiento de todos los deberes que conlleva la patria potestad; y la responsabilidad económica es uno de los deberes de mayor importancia dentro de esta institución, inseparable de los demás.

B. En esta opinión hemos considerado cómo darle curso a la referida reclamación de los demandantes afecta o puede afectar la institución de la patria potestad y la estabilidad e integridad familiar. Debemos ahora aludir, aunque sea brevemente, a otra cuestión, íntimamente relacionada con la anterior: si la reclamación de los demandantes, fundamentada en que han sufrido un "daño" como resultado del nacimiento de un hijo "no deseado", podría tener efectos detrimentales para la estabilidad emocional del menor.

No podemos predecir con completa certeza cómo afectará al menor en cuestión enterarse de que no es en reali-

---

[14] También en *Llopart v. Mesorana*, 49 D.P.R. 250, 260 (1935), citamos a *Nugent v. Powell*, 20 L.R.A. 199, donde la Corte Suprema de Wyoming se expresó de la manera siguiente:

"[L]a ley ha impuesto al padre el deber de cuidar y mantener a su hijo menor de edad, y le ha dado por tanto la custodia y dominio del mismo a fin de que pueda en la mejor forma posible cumplir con estos deberes ...."

dad "dependiente" de sus padres, sino de una persona extraña a éste, que en un momento dado fue el médico de su madre. Pero no es difícil suponer que tendrá efectos detrimentales sobre el menor. El conocer que los padres no lo deseaban y que éstos no se han hecho cargo de su manutención ha de ser doloroso para cualquier ser humano porque marca de manera negativa su nacimiento y desarrollo, y cuestiona su condición esencial de existir. Desde esta perspectiva, la compensación económica que solicitan sus padres representaría para el menor sólo un beneficio pecuniario parcial y pasajero, en detrimento de un beneficio mayor, como sería el establecimiento de una relación normal con sus padres.([15])

 La acción que ostentan los demandantes, pues, podría tener el efecto de imponerle al referido menor una serie de obstáculos y retos emocionales adicionales a los que se presentan de ordinario en la vida de todo ser humano. Estamos jurídicamente compelidos a evitar que esto pase. Para cumplir con nuestra obligación de determinar, en casos limitados, lo que resultaría más beneficioso para un menor, tenemos que evitar, dentro de lo que sea posible, que existan situaciones jurídicas que puedan ponerle en una desventaja emocional en su desarrollo.

 No es nuestra función dictaminar cuál es la manera correcta de querer o criar a los hijos. Sin embargo, tenemos la obligación jurídica de proteger el bienestar emocional del menor y exigir el cumplimiento de los deberes esenciales de los padres que, aunque sirven únicamente como criterio de lo mínimo necesario para asegurar una relación filial saludable, al menos asegura que los padres cumplan con las necesidades básicas de los hijos. Este Tribunal no puede obligar a ningún padre a dar un contenido específico a la relación que habrá de desarrollar con sus hijos, fuera de que ésta sea saludable, en beneficio del

---

([15]) Véase *Martínez v. McDougal*, 133 D.P.R. 228 (1993).

menor y acorde con la ley; pero tampoco puede permitir que se pongan trabas emocionales a las relaciones entre padres e hijos, como las que probablemente surgirían de una acción en daños como la entablada por los recurrentes.

## V

En resumen, el derecho de un hijo al desarrollo de su vida y las indelegables obligaciones paternales que surgen de ello, no pueden ser considerados como daños compensables. Tampoco son imputables, como causalidad, al acto negligente de un médico que no realizó bien una operación de esterilización. Por lo tanto, en el caso de autos los demandantes no satisfacen dos de los requisitos esenciales de la acción de daños configurada en el Art. 1802 del Código Civil, *supra*. Su acción, además, atenta contra las más fundamentales políticas públicas en el campo del derecho de familia. No erró el tribunal de instancia, pues, al desestimar la reclamación correspondiente a los costos de manutención del hijo nacido luego de una operación de esterilización.

## VI

Nos queda por resolver qué efecto, si alguno, tiene sobre los pronunciamientos que hacemos hoy la condición congénita sufrida por el menor.

En su moción de reconsideración, los demandantes no alegaron que la condición congénita de ceguera parcial del niño guardara relación alguna con los actos negligentes imputables al médico u hospital. Alegaron únicamente que la condición congénita era un resultado del nacimiento y que, como tal, debía ser tomada en consideración al fijar la cuantía que procediera en daños.

En relación con los gastos especiales relativos a esta condición, los demandantes en ningún momento han ale-

gado que exista una relación causal separada entre la condición congénita y el acto médico negligente, ya que la condición no fue causada por el acto médico culposo. Por lo tanto, no procede que se compense en este caso por los gastos especiales resultantes de esa condición.([16])

Por los fundamentos aquí expuestos, *se dictará sentencia para revocar la dictada por el Tribunal de Apelaciones, Sección Norte, el 24 de agosto de 1993.*

El Juez Asociado Señor Rebollo López concurrió sin opinión escrita. El Juez Asociado Señor Hernández Denton emitió una opinión concurrente y disidente. La Juez Asociada Señora Naveira de Rodón emitió una opinión disidente.

## — O —

Opinión concurrente y disidente del Juez Asociado Señor Hernández Denton.

A solicitud de la Universidad de Puerto Rico (en adelante U.P.R.) y el Estado Libre Asociado de Puerto Rico (en adelante E.L.A.) revisamos una elaborada sentencia del Tribunal de Apelaciones, Sección Norte, que determinó que los costos de manutención, crianza y educación de un niño nacido luego de que su madre se sometiera a una esterilización negligentemente realizada eran recobrables como parte de una acción en daños y perjuicios. Por entender que permitir dicha compensación militaría en contra de la política pública del Estado referente a la protección y fortalecimiento de la familia y la institución de la patria po-

---

([16]) Este no es un caso en que la condición sea resultado de la negligencia del médico durante el cuidado prenatal o el parto. En esos casos continúa en pleno vigor lo que resolvimos en *Riley v. Rodríguez de Pacheco*, 119 D.P.R. 762 (1988). Tampoco es éste un caso en que la condición congénita haya sido una preexistente y el médico haya sido negligente en diagnosticarla o tratarla. No resolvemos hoy qué aplicaría en esos casos.

testad, estamos de acuerdo con el resultado al cual llega la opinión mayoritaria.

Sin embargo, disentimos de los pronunciamientos sobre nexo causal y los daños compensables vertidos, tanto en el texto como en las notas al calce de la opinión. Además, consideramos que los mismos son innecesarios en vista de que, como explicamos a continuación, es suficiente fundamento para sustentar la determinación que hoy tomamos el hecho de que reconocer que los daños aquí reclamados son recobrables menoscabaría la política pública del E.L.A. en favor de la institución de la patria potestad y la familia. Veamos.

I

Aunque no cabe duda que el advenimiento de un hijo trae mucha alegría en un hogar, lo cierto es que también genera unas obligaciones que requieren mucho sacrificio por parte de los padres. Entre ellas está proveer la manutención y sufragar la educación del hijo. La misma forma parte integral de los deberes impuestos por la institución de la patria potestad.

Como es bien sabido, la patria potestad ha sido definida como " 'el conjunto de derechos y deberes que corresponde a los padres sobre la persona y el patrimonio de cada uno de sus hijos no emancipados, como medio de realizar la función natural que los incumbe de proteger y educar la prole' ". [J.M.] Castán Vázquez, [*La Patria Potestad*, Madrid, Ed. Rev. Der. Privado, 1960], págs. 9–10; *Torres, Ex parte*, 118 D.P.R. 469, 473 (1987). La misma constituye, ante todo, *"un deber u obligación que no puede ser* objeto de excusa [ni renunciada] puesto que está asignada a los padres en virtud de los supremos principios de la moral familiar y razón social del Estado, que la articula en ellos como sujetos a quienes corresponden con exclusividad .... [E]*sta obligación es de carácter personal* no pudiendo ser reali-

zada a través de un tercero ... [y,] además[,] *es intransferible* ...". (Énfasis en el original.) *Álvarez v. Srio. de Hacienda*, 80 D.P.R. 16, 51 (1957), citando a Puig Peña, *Tratado de Derecho Civil español*, T. II, Vol. II, págs. 152–154.

En nuestra jurisdicción existe una clara política pública del Estado en favor de la protección y el fortalecimiento de la familia, la institución de la patria potestad y las relaciones paterno filiales. *Robles v. Otero de Ramos*, 127 D.P.R. 911 (1991); *Romero Soto v. Morales Laboy*, 134 D.P.R. 734 (1993); *Guerra v. Ortiz*, 71 D.P.R. 613, 623 (1950). La misma queda evidenciada mediante la extensa reglamentación de dichas relaciones a través de nuestro Código Civil, 31 L.P.R.A. sec. 601 y ss., el Art. 3 de la Ley de Protección a Menores, Ley Núm. 75 de 28 de mayo de 1980 (8 L.P.R.A. sec. 403), y el Manual de Normas y Procedimientos para los Servicios del Programa de Servicios a Familias con Niños, entre otros. Tan importante es esta política pública del Estado, formulada por los estatutos descritos anteriormente, que nuestro ordenamiento criminaliza el incumplimiento de las obligaciones que la institución de la patria potestad impone. Véanse, entre otros: Arts. 158 y 160 del Código Penal de Puerto Rico, 33 L.P.R.A. secs. 4241 y 4242.

En el caso de autos los demandantes solicitan que se les compense por los costos de manutención y educación del menor. Señalan que el daño por ellos sufrido no es el nacimiento del menor sino la disminución patrimonial que la crianza del mismo les conlleva.

Concurrimos con la opinión mayoritaria en cuanto determina que es precisamente la naturaleza de la compensación aquí reclamada la que nos impide resolver que la misma es recobrable en una acción de daños y perjuicios. Tales costos forman parte integral de las obligaciones exigidas a los padres por nuestro ordenamiento como parte de la institución de la patria potestad. Art. 153 del Código

Civil, 31 L.P.R.A. sec. 601. Es decir, la compensación solicitada incide sobre una obligación irrenunciable de éstos. Así, el reconocimiento de los gastos de manutención y educación del menor como compensables conllevaría trastocar las obligaciones que la patria potestad le impone a los padres del niño y, por ende, militaría en contra de la política pública que dicta que son exclusivamente éstos los llamados al sostenimiento y a la educación de sus hijos.

El andamiaje legislativo que sostiene las relaciones paterno-filiales y la política pública que el mismo encarna limitan en este contexto la responsabilidad del médico incurso en negligencia pues, de lo contrario, estaríamos permitiendo una patria potestad anómala y deforme, dividida entre los padres y un tercero desconocido. Dicho tercero sería un factor que intervendría entre los padres y el menor y crearía una dinámica familiar disfuncional en la que, como en el caso de autos, uno de varios hijos estaría siendo sustentado por un extraño. Esto, a su vez, afectaría negativamente la autoridad de los padres sobre el hijo y tendría como consecuencia que éste no se sentiría que le responde a sus padres porque ellos no son los que le proveen el sustento. Así, coartaría la autonomía paterna en abierta contradicción a la política pública reflejada por nuestro Derecho. Véase Art. 3 de la Ley de Protección a Menores, *supra*.

Por otro lado, en la opinión disidente, al igual que en la sentencia del Tribunal de Apelaciones, se intenta establecer que el resarcimiento que buscan los padres se debe al daño recibido en su patrimonio, lo cual equivale a los costos de manutención del niño. Intentan así deslindar dicho resarcimiento de la patria potestad. Sin embargo, ello ignora que dicha compensación se calcula, tiene el propósito y está destinada para el sustento y la educación del menor en sustitución de los bienes que, según nuestro ordenamiento, deben proporcionar los padres. Tal sustitución no esta permitida por nuestro ordenamiento ya que, como in-

dica la opinión mayoritaria, "la responsabilidad económica de mantener a los hijos es incuestionablemente una parte esencial e integral de las responsabilidades jurídicas de los padres. Es intransmisible e indelegable". (Énfasis suprimido.) Opinión mayoritaria, pág. 327. Véase, además, *Torres, Ex parte*, supra. No es esta la primera ocasión en la que, a base de una política pública del Estado, nos hemos rehusado a reconocer una causa de acción bajo el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141. Un ejemplo reciente de este curso decisorio es *Romero Soto v. Morales Laboy*, supra, en el cual determinamos, a base de la política pública del Estado en favor de la protección del núcleo familiar, que no procedía la acción en daños instada por un ex cónyuge contra un tercero adúltero.

En resumen, los gastos de manutención y educación de un menor nacido luego de que alguno de sus padres se haya sometido a una esterilización negligentemente ejecutada no son recobrables en una acción en daños y perjuicios contra el médico que llevó a cabo dicha esterilización. Esta determinación responde, no a la aplicación de la doctrina tradicional de daños y perjuicios, sino a la sólida política pública del E.L.A. en favor de la protección y el fortalecimiento de la familia y la institución de la patria potestad.

## II

Con respecto a los restantes argumentos expuestos en la opinión mayoritaria disentimos, pues además de erróneos son innecesarios. Incluso, nos preocupan sus implicaciones.

En primer lugar no podemos suscribir una opinión que, a pesar de indicar que no altera lo resuelto en *Torres Ortiz v. Plá*, 123 D.P.R. 637 (1989), con relación a la existencia de una causa de acción a favor de los padres para reclamar por los costos relacionados con el embarazo, parto y operaciones de esterilización, implícitamente se fundamenta en

que los resultados de una esterilización negligentemente ejecutada no constituyen un daño. Dicho fundamento conceptual tiene su génesis en el intento de demostrar que los daños reclamados en estos casos, es decir, el embarazo que se trató de evitar y los gastos de manutención y crianza, son "cualitativamente distintos" y, por lo tanto, separables el uno del otro, de forma que uno es un daño y el otro no. Así se desprende de la propia opinión cuando se señala que "[e]sta reclamación no está relacionada directamente con las intervenciones médico-quirúrgicas, sino propiamente con el deber de sostener y criar al niño, que surge primordialmente de la responsabilidad jurídica y moral que tienen, en nuestra sociedad, *todos* los padres en relación con sus hijos". (Énfasis en el original.) Opinión mayoritaria, pág. 312.

No tenemos duda de que dicha distinción es insostenible. Ambos daños son inseparables, pues el embarazo y el nacimiento conducen inescapablemente al desarrollo y a la manutención del niño. Más aún, tanto el embarazo como la manutención y crianza del niño tienen un efecto directo sobre el patrimonio de los padres, puesto que conllevan la disminución del mismo.

El argumento de la mayoría es, además, inconsistente, puesto que si bien hace un intento de separar el embarazo y nacimiento del niño de la manutención del mismo como daños "cualitativamente distintos", al explicar la reclamación de los demandantes indica que "[e]stos aducen que el daño por el cual solicitan indemnización no es el nacimiento o la existencia del hijo en sí, sino el menoscabo patrimonial que sufrirá su familia a consecuencia de la carga económica que conllevaría la crianza de éste. Esta distinción es insostenible y apareja, además, una seria distorsión de los fundamentales valores jurídicos pertinentes". Opinión mayoritaria, págs. 312–313. La mayoría parece olvidar que fue precisamente por el efecto que sobre el patrimonio de los padres tenía el embarazo, entre

otros, que reconocimos en *Torres Ortiz v. Plá*, supra, una causa de acción a favor de los padres. Así, la opinión que hoy emite una mayoría de este Foro implícitamente desarticula los cimientos sobre los cuales se construyó la doctrina expuesta en *Torres*, a base de una concepción religiosa subyacente que no debería tener cabida en nuestras decisiones.

En segundo lugar, no podemos suscribir las expresiones del Tribunal en torno al problema del nexo causal en cuanto sostiene que "[d]esde este punto de vista, la causa próxima o inmediata, sin la cual el nacimiento no hubiese sido posible, fue, pues, el acto sexual entre los demandantes, no el acto negligente del médico". Opinión mayoritaria, pág. 319, esc. 11. La demandante se esterilizó precisamente para poder sostener relaciones sexuales con su marido sin la preocupación de quedar nuevamente embarazada. Fue porque asumían que la laparoscopía había sido diligentemente ejecutada que los demandantes sostuvieron las relaciones sexuales. Por lo tanto, no tenemos duda de que la causa adecuada del embarazo de la demandante fue la esterilización negligente. *Jiménez v. Pelegrina Espinet*, 112 D.P.R. 700 (1982). Si aun luego de realizarse la laparoscopía, la demandante iba a tener que abstenerse de tener relaciones sexuales, ¿para qué someterse a tal operación?

Además, nos preocupa que la Opinión del Tribunal apoya su conclusión en lo referente al nexo causal en la premisa de que otras jurisdicciones han resuelto "que aun de existir una relación causal entre la negligencia del médico y el mantenimiento del hijo, ésta es demasiado remota". (Énfasis suprimido.) Opinión mayoritaria, pág. 320. Un análisis de la jurisprudencia que apoya esta posición demuestra que ésta se fundamenta en una aplicación de la doctrina de mitigación de daños. En la misma se asume que "la causa de los costos de manutención del re-

cién nacido no es la negligencia del médico, sino el hecho de que los padres ... decidieron criar al niño en lugar de darlo en adopción". (Énfasis suprimido.) Opinión mayoritaria, pág. 320. Estas jurisdicciones han decidido que no procede la indemnización porque al no escoger la alternativa de la adopción o del aborto los padres, en efecto, decidieron no mitigar los daños causados por la esterilización negligente.[1] *Robak v. United States*, 658 F.2d 471, 479 (7mo Cir. 1981); *Sorkin v. Lee*, 434 N.Y.S.2d 300 (1980); *Rieck v. Medical Protective Co. of Fort Wayne, Ind.*, 219 N.W.2d 242 (1974). Véanse, además, las discusiones de las distintas posiciones de algunos tribunales norteamericanos en *Boone v. Mullendore*, 416 So. 2d 718, 723 (Ala. 1982), y *Cockrum v. Baumgartner*, 447 N.E.2d 385 (Ill. 1983).

Se nos hace imposible reconocer la aplicación de la doctrina de mitigación de daños a casos como el de autos. De permitirla, las opciones que tendrían los padres para mitigar los daños serían la adopción, mencionada por la mayoría, y el aborto. En este contexto, la aplicación mecánica de la doctrina de mitigación de daños sería detrimental para los padres y sus familiares, pues les penaliza por no recurrir a un aborto o no entregar a su niño en adopción. La aplicación de esta norma sería contraria a la política pública de nuestro país de favorecer la solidaridad familiar.

Tal resultado sería también contrario al derecho de intimidad de los matrimonios, el cual les protege de intromisiones no deseadas en sus decisiones fundamentales relacionadas con la familia sobre contracepción y aborto. *Pueblo v. Duarte Mendoza*, 109 D.P.R. 596 (1980). Véanse, además: *Boone v. Mullendore*, supra, citando a *Roe v. Wade*, 410 U.S. 113 (1973); *Doe v. Bolton*, 410 U.S. 179 (1973); *Griswold v. Connecticut*, 381 U.S. 479 (1965).

---

[1] Aun cuando en la opinión disidente, al igual que en la sentencia del Tribunal de Apelaciones, se reclama la aplicación íntegra de la doctrina tradicional de responsabilidad extracontractual al caso de autos, lo cierto es que en ninguna de dichas ponencias se hace referencia a la obligación de mitigar los daños que tiene todo demandante en daños y perjuicios. *Fresh-O-Baking Co. v. Molinos de P.R.*, 103 D.P.R. 509 (1975). Nos preocupan ambos extremos.

Así, no tenemos duda de que la determinación a la cual hoy llegamos debe responder y responde, no a la aplicación técnica del derecho mediante la invocación de la doctrina tradicional de daños y perjuicios, sino a la sólida política pública del E.L.A. en favor de la protección y el fortalecimiento de la familia y la institución de la patria potestad.

— O —

Opinión disidente emitida por la Juez Asociada Señora Naveira de Rodón.

Por estar sustancialmente de acuerdo con la mayor parte de la opinión emitida por el Tribunal de Apelaciones, no podemos acoger la posición que hoy adopta la mayoría de este Tribunal. El Tribunal resuelve que en una acción por impericia médica por negligencia al realizar un procedimiento de esterilización, instada por los padres de una criatura nacida con posterioridad a la misma, no procede la compensación por los costos que conllevaría la manutención, crianza y educación del niño.[1]

Tras un cuidadoso estudio de las últimas tendencias y aportaciones de otras jurisdicciones sobre el novel asunto, particularmente jurisprudencia civilista,[2] del *common law*,[3] angloamericana[4] y diversos artículos de revistas

---

[1] Tribunal de Apelaciones, Sección Norte, panel integrado por los Jueces Sánchez Martínez, Ramos Buonomo y Segarra Olivero. La Hon. Ramos Buonomo fue la Juez Ponente.

[2] Indica la sentencia del Tribunal de Circuito de Apelaciones que aunque en el derecho civil este tema no ha sido ampliamente discutido, en el ordenamiento alemán existen casos de esterilización infructuosa en donde la Corte Suprema Federal Alemana concedió daños resultantes de dicha esterilización, incluyendo los costos de manutención del menor siendo éste saludable.

[3] La sentencia cita un caso de la División Civil de la Corte de Apelaciones, *Emch v. Kensington*, 3 All ER 1044, CA (1984). La corte determinó que como resultado de la negligencia del médico al practicar la esterilización, los daños compensables se extendían a cualquier pérdida económica razonablemente previsible y directamente causada por el embarazo inesperado. La corte concluyó que en este caso la demandante podía recobrar lucro cesante, los costos de manutención de la niña (incluyendo gastos especiales debido a la condición física de la bebé, resultado de defectos congénitos). La corte adoptó la regla del beneficio que requiere que se reste de los

jurídicas, el Tribunal de Apelaciones emitió una bien fundamentada opinión que recurre a la razón y a la ley. Entre otros puntos destacó que las personas tienen la libertad para escoger si se concibe o se trae al mundo a una criatura y que el Tribunal Supremo de Estados Unidos ha reconocido que el derecho a la intimidad protege a un matrimonio de intromisiones en las decisiones sobre contracepción y aborto. *Roe v. Wade*, 410 U.S. 113 (1973); *Doe v. Bolton*, 410 U.S. 179 (1973); *Griswold v. Connecticut*, 381 U.S. 479 (1965); *Pueblo v. Duarte Mendoza*, 109 D.P.R. 596 (1980).[5] Además, señaló que en Puerto Rico el concepto de intimidad tiene raíz constitucional. Art. II, Sec. 8, Const. E.L.A., L.P.R.A., Tomo 1.

En nuestra jurisdicción procede una acción de daños y perjuicios basada en la impericia profesional de un médico al practicarle negligentemente una esterilización a un paciente. *Torres Ortiz v. Plá*, 123 D.P.R. 637 (1989). Si en ese caso reconocimos que no existen razones de política pública que impidan compensar, entre otros, daños por angustias mentales y sufrimientos físicos, por la fallida este-

---

costos de manutención los beneficios que los padres recibirían por el nacimiento y la crianza del niño.

(4) Sobre la jurisprudencia existente en Estados Unidos, el Tribunal de Apelaciones indica que "no existe uniformidad entre las distintas jurisdicciones estatales en cuanto a la compensación por los costos de manutención y crianza de un niño, producto de una esterilización negligente. Sin embargo, al hacer un análisis del desarrollo de la jurisprudencia, podemos observar que ésta se ha ido moviendo de una negación a conceder daño alguno por este concepto, pasando por una etapa intermedia donde se conceden los daños pero se le deducen los beneficios que representa el nacimiento del hijo para los padres; hasta concederlos en su totalidad sin ningún tipo de reducción a la compensación. Hasta la fecha han habido cuatro tendencias en las decisiones judiciales de los estados que han tratado el tema: (1) la primera tendencia fue la de no conceder daño alguno en una acción de daños por esterilización negligente; (2) la tendencia predominante ha sido la de limitar los daños a aquellos que ocurren como el resultado del embarazo, operaciones y el nacimiento, y no compensar por los costos de manutención y crianza del niño; (3) la tendencia intermedia ha sido la de compensar por todos los daños que surjan del acto torticero, incluyendo los costos de manutención, pero, a su vez, contrapesarlos con los beneficios que recibirán los padres como consecuencia de tener a un niño saludable; (4) últimamente, sin embargo, la tendencia ha sido la de compensar por todos los daños que surjan del acto torticero, incluyendo los costos de manutención".

(5) En *Pueblo v. Duarte Mendoza*, 109 D.P.R. 596 (1980), reconocimos que en Puerto Rico aplica la norma jurisprudencial federal relativa al aborto.

rilización y, por ende, esta compensación no afecta a la criatura, no entendemos como la mayoría del Tribunal concluye ahora que un niño puede afectarse porque sus padres reciban, además, una compensación para ayudarlos a criarlo, protegerlo y educarlo adecuadamente.[6]

Respecto a las consideraciones de política pública utilizadas por los tribunales para denegar los costos de manutención en los casos de esterilización negligente, el Tribunal de Apelaciones señaló que el factor principal en un caso de una esterilización infructuosa es de naturaleza económica. No es que el niño nacido sea un daño compensable, sino que los demandantes sufrieron un daño económico, particularmente en el caso donde se trata de una familia que vive en una situación económica precaria y que la razón para solicitar la esterilización haya sido precisamente ésta. Los costos de manutención, crianza y educación de un niño son una consecuencia razonablemente previsible de la negligencia del médico por la cual debe responder bajo nuestro derecho de daños. Esta fue la consecuencia que los demandantes trataron de evitar al someterse la codemandante, Dominga Soto Cabral, al procedimiento de esterilización.

Lejos de debilitar los lazos familiares, la concesión de los costos de manutención los fortalecerá y ayudará a los padres a proveer para el hijo nacido, repondrá los recursos económicos de la familia, evitando así causar perjuicio a los demás miembros de la familia. La cuantificación de costos de manutención, crianza y educación de un niño no es una tarea imposible ni resultan ser especulativos. Sólo se requiere un cálculo de gastos razonablemente previsibles.

El cómputo de la compensación por los gastos de manutención y educación del niño nacido tras una operación de esterilización infructuosa debe estar enmarcado dentro de

---

[6] En *Torres Ortiz v. Plá*, 123 D.P.R. 637 (1989), determinamos que probada la negligencia y la relación causal procede compensar los gastos médicos incurridos en el parto y la esterilización, las angustias mentales y los sufrimientos físicos, el lucro cesante y los demás daños.

la doctrina delineada por este Tribunal en el área de la compensación por daños. Son principios relevantes al caso de autos que: (1) "daño" es todo aquel menoscabo material o moral que sufre una persona, ya en sus bienes vitales naturales, o en su propiedad o patrimonio, causado en contravención a una norma jurídica y por el cual ha de responder otra (*García Pagán v. Shiley Caribbean, etc.*, 122 D.P.R. 193, 205–206 (1988)); (2) la responsabilidad civil es el deber de resarcir, otorgando un valor económico al daño sufrido (Íd.); (3) el resarcimiento o indemnización pecuniaria consiste en atribuir al perjudicado la cantidad de dinero suficiente para compensar su interés perjudicado, o sea el daño causado al patrimonio de éste (*Rodríguez Cancel v. A.E.E.*, 116 D.P.R. 443, 455–456 (1985)); (4) se tiene que presentar prueba que sostenga la concesión de indemnización por daños (*Rodríguez Cruz v. Padilla Ayala*, 125 D.P.R. 486 (1990), y que (5) en la determinación de daños (específicamente en el caso de las partidas por lucro cesante), no se puede estimar la indemnización sobre bases hipotéticas (*Velázquez v. Ponce Asphalt*, 113 D.P.R. 39, 49 (1982)).

Estimamos que surge un daño que reduce en forma específica el patrimonio de los padres encargados de proveer alimentos y educación a un hijo nacido tras un proceso de esterilización fallido debido a actuaciones negligentes del médico.[7] Dicho daño afecta las posibilidades y los recursos económicos con los que contaban los padres para alimentarse a sí mismos y para alimentar y educar a los hijos habidos antes de la operación. El médico tiene la responsabilidad civil de responder por los daños y perjuicios causados por sus actos negligentes al practicar una esterilización a un paciente. *Torres Ortiz v. Plá*, supra.

Ahora bien, la determinación de la cantidad de dinero

---

[7] El sostenimiento de la familia y la educación de los hijos es una obligación de la sociedad de bienes gananciales. Art. 1308(5) del Código Civil, 31 L.P.R.A. sec. 3661; *Mundo v. Cervoni*, 115 D.P.R. 422 (1984).

necesaria para compensar el daño de los padres perjudicados por la acción negligente del médico que realiza una esterilización negligente se tiene que estimar tomando en cuenta las partidas de los costos reales de la manutención y educación del niño, así como el presupuesto y las posibilidades económicas de los padres, ya que lo que se está concediendo es la pérdida sufrida por los padres y éstos no pueden perder más de lo que no tienen. Además, a tono con las disposiciones del Código Civil sobre el deber de alimentar y educar a los hijos menores de edad, las partidas por concepto de alimentos se deben computar de acuerdo con la fortuna y posición social de la familia. Art. 142, 143 y 153 del Código Civil, 31 L.P.R.A. secs. 561, 562 y 601.

Lo antes expuesto requiere que para computar el daño o pérdida económica de los padres perjudicados por la esterilización negligente se considere, entre otros, la disminución de recursos o ingresos con los que cuentan para alimentar a todos sus hijos menores de edad; los ingresos reales de la pareja al momento en que se optó por la esterilización, así como el potencial de aumento de dichos ingresos, tomando en cuenta las profesiones u ocupaciones de la pareja; los gastos en que incurrían en la manutención y educación de cada uno de los hijos habidos antes de la esterilización, y si la madre o el padre renunciaron a su empleo para cuidar al nuevo miembro de la familia, entre otros.[8]

---

[8] Contrario a lo expresado por el Tribunal de Apelaciones, no es necesario discutir si es aplicable la regla del beneficio que, dirigida a evitar supuestamente un enriquecimiento injusto por parte de un demandante, proclama que se deben deducir los beneficios que los padres recibirán en virtud de tener un hijo normal y saludable. Primero, como expresa el propio Tribunal de Apelaciones, no está ante nuestra consideración y segundo, mediante las claras guías aquí expuestas entendemos que no existe dificultad para determinar y cuantificar el daño económico sufrido por la pareja que opta por un procedimiento de esterilización cuando la misma se practica de forma negligente. Nuevamente, como el niño no es el daño, no hay que entrar en discusiones sobre la valorización de la vida humana o los beneficios innumerables que reciben las personas a través de la relación padre e hijo, puesto que "la vida de un hijo, desde el punto de vista del afecto y del cariño, tiene un valor inconmesurable que no se presta a valoración objetiva". *Travieso v. Del Toro y Travieso, Int.*, 74 D.P.R. 1009, 1028 (1953).

En cuanto a la condición de "amaurosis congénita de Liebers" que padece el niño de los peticionarios, ésta no es resultado de la negligencia o impericia profesional del médico que practica una esterilización. No existe relación causal entre la esterilización negligente y la condición congénita del niño, por lo tanto, en este caso, no procede que se compensen gastos especiales.(9) En casos de mala práctica médica tiene que surgir de la prueba presentada que el tratamiento ofrecido por el médico demandado fue el que con mayor probabilidad causó el daño. *Torres Ortiz v. Plá*, supra; *Rodríguez Crespo .v. Hernández*, 121 D.P.R. 639 (1988); *Cruz v. Centro Médico de P. R.*, 113 D.P.R. 719 (1983).

Finalmente, en casos como el de autos, debemos recordar que "[e]l Derecho no se nutre de postulados absolutos y sí de ecuaciones que reconocen un equilibrio de factores y fuerzas contradictorias que conjugadas resultan en una adjudicación de fundamental justicia". *Morales Garay v. Roldán Coss*, 110 D.P.R. 701, 705 (1981).

Por todo lo antes dicho, modificaríamos la sentencia del Tribunal de Apelaciones, Sección Norte, determinando que en una acción por impericia médica instada por los padres de una criatura nacida a consecuencia de una esterilización negligente, los costos de manutención, la crianza y la educación del niño son compensables; que no es de aplicación la regla del beneficio, y que, en este caso, no es determinante la condición congénita del menor para computar la cuantía que habría de concederse.

---

(9) No estamos de acuerdo con la determinación del Tribunal de Apelaciones respecto a que la condición congénita del menor no es determinante para la procedencia de los costos de crianza, pero sí para determinar la cuantía que se conceda.